OLCOTT *v.* TIOGA RAILROAD COMPANY: SAME *v.* SAME.

The president of a railroad corporation was allowed for three years to purchase locomotives, giving bills for them purporting to bind the company, and to run them upon the road, which he managed in his discretion. Afterwards, the directors resumed the charge of the road and of the property thus obtained, and for some years, though they did not settle, did not question, the accounts rendered by the president of these transactions. This acquiescence is such a ratification as to be evidence of the president's original authority to bind the corporation by bills given for the locomotives.

A bill dated at the office of the corporation, signed with the name of the president, with the addition of his title of office, abbreviated, and directing the contents to be charged " to motive power and account," purports on its face to be the bill of the corporation, and not that of the signer individually.

A corporation owning and operating a railroad making a continuous line with that of another corporation may, *it seems*, irrespective of any special provision in its charter, lawfully contract with the latter company for the joint purchase and ownership of locomotives to be used on both roads. If otherwise, the power is implied in a legislative provision for the connection of the first railroad with a point at the further end of the second, " by railroad, canal, or slackwater navigation."

Evidence is admissible in support of the president's authority to draw the bill in question that he had, on various occasions, as well after as before, executed similar bills and notes which had been paid, and the sums thus expended entered into the accounts of the corporation which were before its managers for years without objection.

A coal company indebted to the railroad corporation for freights gave its notes for a less amount, which the latter indorsed and procured to be discounted. There being no evidence that the coal company received the avails of the notes, it is immaterial, in respect to the objection that the notes were indorsed for its accommodation, that it did not appear whether these notes were given to apply on the coal company's indebtedness. If so, the railroad corporation was the owner; if not, the notes were lent for its accommodation.

In the absence of an express finding on the point, and if necessary to support the judgment against an objection that it was *ultra vires* for the railroad corporation to borrow notes, it would be assumed that the notes were given to apply on the coal company's indebtedness.

A single seal appended to a notary's certificate of protest is a sufficient authentication of his certificate beneath the seal, and on the same page, of the service of notice of non-payment.

The mortgagee of a chattel may, it seems, purchase at public sale and hold it for his own benefit and free from any equity of redemption. If otherwise, the purchase is good at law, and is in equity not void but voidable only at the election of the mortgagor. The purchase cannot be impeached in a suit to which the mortgagor is not a party.

THESE actions were tried before the same referee, and argued in this court together. Though the causes of action were entirely distinct, the evidence was, in a great measure, the same, and the questions presented for decision to some extent the same, in both actions. It is, therefore, convenient to present them together.

The first action was brought to recover the amount of a bill of exchange, of which this is a copy :

"OFFICE OF THE TIOGA NAVIGATION COMPANY,

"*Philadelphia, May* 19, 1841.

"Dolls. 9,064$\frac{71}{100}$. Twelve months after date, pay to the order of Messrs. Rogers, Ketchum and Grosvenor, nine thousand sixty-four $\frac{71}{100}$ dollars, at No. 65 Liberty street, in the city of New York, value received, which charge to motive power and account, and oblige

"Yours, &c.,

"JAMES R. WILSON,

"Prest. T. N. Co.

"To HIRAM BOSTWICK, Esq.,

"Treas. Tioga Coal, Iron Mining and

Manufacturing Co., Corning, N. Y."

In the complaint it was alleged that, at the date of the bill, the defendant, a corporation created by and under the laws of the State of Pennsylvania, by its then name of The Tioga Navigation Company (since changed by the legislature of that State to The Tioga Railroad Company), for value received, made the said bill of exchange; that it was duly accepted "by the said Hiram W. Bostwick, treasurer, as aforesaid;" and was duly indorsed by Rogers, Ketchum and

Grosvenor to the plaintiff, and when due, after demand of payment, and refusal, was duly protested and notice given to the defendant. The defendant, by its answer, put in issue all the allegations of the complaint.

The second action was brought to recover the amount of eight promissory notes made in September, October and November, 1841, by the Arbon Coal Company, payable to the order of the Tioga Navigation Company, three months after date, indorsed by the Tioga Navigation Company to the plaintiff, which notes, it was alleged, were duly protested for non-payment, and notice thereof given to the defendant. The defendant put in issue the statements of the complaint, and alleged that the notes were indorsed in its name by James R. Wilson, without authority; that he was not, at the time of such indorsement, the president, or an officer or stockholder, of the company; that, by the act of incorporation, the president, secretary and treasurer of the company were required to be residents of the State of Pennsylvania; that, at the time of making the indorsement, Wilson was not a resident of Pennsylvania, but was, and for a long time had been, a resident and citizen of New York; also, that the notes were indorsed for the accommodation of the Arbon Coal Company without consideration, and not in any respect for the benefit of the defendant; also, that the payment of the notes was secured by a mortgage upon real estate in Pennsylvania, executed by the Arbon Coal Company to three trustees (Ketchum, Alstyne and Thompson), and a mortgage upon personal property to Ketchum alone, as trustee, for the use of the holders of the notes and other creditors of the mortgagors; and that, after default in making payment, the mortgages were foreclosed, and the property sold for the benefit of the holders of the notes, and that the same were thereby paid and satisfied. It was also alleged that, before the plaintiff became the owner or holder of the notes, they were owned and held by Ketchum, Rogers and Bement, who received from the makers of the notes a large amount of property to be applied to their payment and satisfaction; that the property so received by them

was of more than sufficient value to pay the notes; that such property had never been returned or accounted for by them, but the same, or its avails, were still held and retained by them; and that, while the property and notes were so held by them, the makers became and still remained insolvent; that the notes were transferred to the plaintiff long after they became due; that he neither paid nor advanced anything for or on the credit of them, and received them with full notice of the foregoing facts.

On the trial, the incorporation of the Tioga Navigation Company, by the legislature of Pennsylvania, and by the proclamation of the governor of that State, in pursuance of the act of the legislature, was shown, the original act having been passed in 1826. The primary object of the corporation, as shown in the act under which it was created, was the construction of a navigable canal, or slackwater navigation, along the line of the Tioga river, from the State line of New York, at or near Lawrenceville, to certain coal beds at Blossburgh, in the State of Pennsylvania, with power to collect tolls, subject to regulation by the legislature of that State. The charter provided for the choice, annually, by the stockholders, of a president, ten managers, a treasurer, and such other officers as should be deemed necessary; the president and managers to conduct the business of the company, and to hold their offices for one year, and until others should be chosen. By a supplement passed in 1828, the company was authorized to construct a railway, in lieu of a canal or slackwater navigation; and in 1850, the name of the company was changed to "The Tioga Railroad Company." By an act passed in 1835, the State guaranteed the payment of five per cent interest on a loan of $150,000 for twenty years, in aid of the company, with a proviso that the act should not take effect until one year after the road should have been completed and in full operation, or until the same should have been connected with the Chemung canal, by railroad, canal or slackwater navigation.

In January, 1837, James R. Wilson was chosen one of the managers of the company, and continued in that post until

1850. In January, 1838, he was chosen president; was re-elected in January, 1839, and continued to act as president until January, 1844, no meeting of the stockholders having been held in the intermediate time.

In January, 1837, the board of managers appointed an executive committee, composed of three managers, together with the president, " with power," as declared in their resolution, " to enter into and conclude any engagement, negotiations or course of proceedings, which shall be final as much as if done by the board of managers." In January, 1838, a like committee was appointed, with the same powers. On the 2d of April, 1838, the board of managers passed the two following resolutions:

"*Resolved*, That the executive committee shall be and are hereby invested with full power to enter into and conclude any arrangements and contracts for the reciprocal and convenient use of the road of the Tioga Coal, Iron Mining and Manufacturing Company, or the road of the Williamsport and Elmira Railroad Company, or for other purposes, on such terms as to said committee may appear advisable.

"*Resolved*, That in the interval between the quarterly meetings of the board, the said executive committee shall exercise and enjoy the full powers of the board to act for and to bind the company."

On the 17th of May, in the same year, by the executive committee, it was resolved " that James R. Wilson, the president, be authorized and empowered to negotiate the loan of one hundred and fifty thousand dollars, on the best terms which may offer, and that he be invested with the powers of the executive committee."

On the 1st of October, 1839, the same committee resolved " that James R. Wilson, president, be authorized to purchase of Baldwin, Vail and Hufty, a locomotive and tender, for the sum of $7,000, and to give the notes of the company at six months for the same;" " that the president be authorized and empowered to act in all the ordinary business of the company, as fully as this committee may do."

At a meeting of the managers, held on the 20th of February, 1841, which was the last meeting of that board prior to January, 1844, an agreement which had been entered into between the Tioga Navigation Company and the Tioga Coal, Iron Mining and Manufacturing Company, executed by their respective presidents and secretaries in the previous September, was submitted to and ratified by the board. It provided for uniting the roads at the State line, so as to "form one continuous road from Blossburgh to Corning," and allowing to the locomotives and cars of either company the right of uninterrupted passage over the whole line, subject to regulations to be established by the Tioga Navigation Company, and subject to the tolls of the respective roads. At the same meeting the executive committee was reduced to three (George Rundle, H. W. Bostwick, and the president), and it was resolved "that the executive committee, or a majority, be and are hereby fully authorized to act for and bind the company." The minutes showed nothing further of the proceedings of stockholders, managers or committee, until January, 1844.

Prior to the time when Mr. Wilson became president of the company, very little had been done toward the construction of the road. A part of the grading had been done, the right of way had been generally secured, and some 40 or 50,000 dollars had been expended. From that time the management of the business of the company appears to have devolved mainly upon the president, and, after February, 1841, almost exclusively, aided occasionally by Mr. Bostwick, one of his associates on the executive committee, who was also the treasurer of the Tioga Coal, Iron Mining and Manufacturing Company, a company chartered in the State of New York, with authority to construct a railroad from the State line of Pennsylvania to Corning in the State of New York. Under the authority given to him by the executive committee, Mr. Wilson negotiated the loan of $150,000, or a large part of it, and with the proceeds of that loan and other means of the company, and its credit, as far as such credit could be made available, the road was completed and put in use in July or

August, 1840. It was done under the general direction and superintendence of the president, who was constantly occupied with its affairs, managing its finances, making purchases of materials and furniture, embracing locomotives and cars, and paying for labor performed for the company, and attending generally to everything pertaining to the construction and equipment of the road.

Prior to any of the transactions involved in either of the present suits, an arrangement had been made between the Tioga Navigation Company and the Tioga Coal and Iron Mining and Manufacturing Company for the purchase of locomotives together, to be owned by the two companies, five-eighths by the former and three-eighths by the latter, which was in proportion to the length of their respective roads. Under this arrangement four locomotives were procured and placed upon the road, three of which were purchased by the president of the Tioga Navigation Company, and were paid for by notes and drafts drawn by him in behalf of the company, which were paid by the company. At the time of the meeting of the managers, in February, 1841, three of such locomotives and a considerable number of cars were on the road, which had been purchased by the president, and for which he had given notes or drafts in behalf of the company; and other similar drafts and notes were outstanding, to a considerable amount, which had been given by him for money borrowed, and in payment for work done and property purchased for the company. This indebtedness, and the necessity of providing means for its payment, was a subject of discussion at that meeting; but the particular transactions do not appear to have been separately or specially alluded to.

The bill of exchange which was sought to be collected in the first action was given in payment for a locomotive and tender, constructed by the payees named in the bill, in pursuance of a contract in writing made with them on the 11th day of January, 1841, executed by "James R. Wilson, President of the Tioga Navigation Company, and Hiram W. Bostwick, Treasurer of the Tioga Coal and Iron Mining and Manufac-

turing Company," by which the said payees agreed to build "for said companies" a locomotive and tender [as described], and deliver them at Jersey City, on the first day of May then next, for $7,920, "payable in the city of New York, in the draft of J. R. Wilson, President, accepted by H. W. Bostwick, Treasurer, at twelve months from delivery, interest being added at seven per cent per annum." Some alteration was made in the plan of the locomotive, at the request of the purchasers, after the date of the contract, which increased the price to the amount for which the draft was given. The locomotive was placed upon the road, under the arrangement before mentioned between the two companies, and in December, 1841, was mortgaged by the defendant, with other property, to the Bank of Corning, to secure a debt of $35,000, which the company owed to that bank. It continued to be used on the road as late as 1843, when the other property mortgaged was repurchased by the defendant on a foreclosure of the mortgage.

No accounts were rendered by Wilson, of his transactions in behalf of the company, after February, 1841, until 1844, after he ceased to be president. He then rendered accounts, containing the details of those transactions, which do not appear to have been finally settled; nor does it appear that any particular objection was made to them. He was re-elected as a manager annually from 1844 to 1849, inclusive, and during some of the years acted as superintendent of the road.

On the proof, of which the foregoing is a brief outline, together with proof that the bill was duly protested, and notice of its dishonor, at maturity, given to the drawers, and that it was assigned by the payees to the plaintiff in January, 1844, the plaintiff relied for a recovery in the first action

The defendant's counsel moved for a dismissal of the complaint, on the grounds (with others not here relied upon): 1. That the draft was the obligation of Wilson, and not of the defendants; 2. That the use of the locomotive upon the road furnished no evidence of ratification; that such use was the act of Wilson, and itself needed ratifying; 3. That the

draft was drawn in contravention of the charter and by-laws of the defendant, and was incapable of ratification ; 4. That if the defendant was liable at all, it could only be upon an implied assumpsit for the value of the engine, and that jointly with the New York company.  The referee denied the motion, and the defendant's counsel excepted.

Several exceptions were taken by the defendant's counsel to the introduction of evidence, which are noticed in the following opinion.

The defendant introduced some testimony, not materially varying the case, so far as relates to the questions in controversy here.  A chattel mortgage was introduced, given by the Arbon Coal Company, to secure the amount of the draft in controversy, with other demands, a part of the proceeds of which were applied by the referee in reduction of the amount due on the draft.

The referee found: 1. That the defendant made the draft upon which the action was brought; 2. That the draft was duly protested for non-payment; 3. That $2,926.17 of the amount made on the mortgage of the Arbon Coal Company should be credited as payment on the draft, as of August 14, 1843 ; 4. That the amount remaining due on the draft, after the reduction, at the date of the report (February 28, 1861), was $15,415.20 ; 5. That, as a conclusion of law, the plaintiff should have judgment for that sum, and costs.

In the second action, it was shown that the notes mentioned in the complaint were made by the Arbon Coal Company, six of them being executed in the name of the company, by James R. Wilson, treasurer, and two by the president of the company ; that, at the time when they were made, the coal company was largely indebted to the defendant for freight on coal which had been carried over the defendant's road ; that the defendant was embarrassed and in bad credit, and needed money to meet its obligations ; that the coal company was in good credit, with ample means for the payment of its debts, but such means consisted in coal and not in cash.  Under these circumstances the notes were made, without, so far as the proof showed, any

specific agreement whether they should apply upon the indebtedness of the coal company for freight or not. They were, however, given to enable the defendant to raise money upon them, for its own use. They were all indorsed by the Tioga Navigation Company, by James R. Wilson, president, and procured to be discounted by him and Mr. Bostwick, one of the executive committee, for the benefit of that company. What became of the money after the notes were discounted, was not shown. It was proved that Mr. Wilson moved, in the fall of 1841, with his family, from Pennsylvania to Albany, in the State of New York, and continued to reside there until the fall of 1842.

The evidence of the protest of all the notes, excepting one, consisted of the usual certificate of protest by a notary public, signed and sealed by him, with his seal of office attached to each note, and immediately beneath each certificate of protest; and on the same sheet was a certificate of the mailing of notices of protest, on the same days of the respective protests, properly addressed to the indorsers, which certificates were signed by the notary officially, but were not separately sealed. The reading of the notices was objected to, on account of the want of seals; the objection was overruled, and the defendant's counsel excepted.

The transfer of the notes to the plaintiff, in 1844, was proved.

The defendant's counsel moved to dismiss the complaint, on the grounds: 1. That Wilson had no power to bind the company by the indorsement of the notes; 2. That Wilson was not president of the company, because his term of office had expired, and because he had removed out of the State of Pennsylvania; 3. That the indorsement was in contravention of the charter and by-laws of the company; 4. For the insufficiency of the notice of protest. The motion was denied, and the defendant's counsel excepted.

The defendant then proved the execution, by the Arbon Coal Company, in 1842, of the mortgages mentioned in their answer; that in August, 1843, the personal mortgage was

foreclosed, and the property bid off at the foreclosure by the mortgagee, and taken possession of by him for the benefit of the holders of the demands intended to be secured, the whole proceeds of such sale 'being $14,074. It then offered proof of the value of the property, which was excluded by the referee, and its counsel excepted to the ruling.

The referee found: 1. That the notes were indorsed by the defendant; 2. That they were duly protested for non-payment, and notice of protest served on the defendant; 3. That $6,946.90 should be credited on account of the proceeds of the mortgage of the Arbon Coal Company, as of August 14, 1843; 4. That the amount remaining due on the notes at the date of the report (February 28, 1841), was $36,596; 5. That the plaintiff was entitled to judgment for that sum, with costs.

Judgments entered in pursuance of those reports were affirmed at the general term of the Supreme Court; and from those judgments the defendant brought the present appeals.

*H. M. Hyde* and *John H. Reynolds*, for the appellant.

*George T. Spencer* and *John K. Porter*, for the respondent.

SELDEN, J. The referee has found, as a fact, that the draft upon which the first action was brought was executed by the defendant; and that finding includes an affirmation of the authority of Wilson, the president of the company, to make the draft in its behalf. If there was any evidence proper to be considered by the referee, tending to sustain this finding, sufficient to justify the denial of the defendant's motion to dismiss the complaint, the finding cannot be disturbed on appeal to this court. I think there was not only some evidence to justify the conclusion of the referee, but do not see how he could have arrived at a different result. It was within the power of the board of managers to clothe the president with authority to make the purchase of the locomotive, and to give the obligation of the company in payment for it. The language of the charter is, " the president and managers shall

conduct the business of said company;" and there is nothing in the charter, or any of its supplements, to restrain this extensive power, so far as relates to the present question. The purchase of locomotives was a part of the legitimate "business of the company;" and it cannot be questioned that the president and managers could appoint an agent with full powers to make such purchases, whether the agent was one of their number or a stranger (Ang. & Ames on Corp., ch. 8, § 1; ch. 9, § 2); and to execute bills or notes of the corporation in payment of debts thus incurred. (*Curtis* v. *Leavitt*, 15 N. Y., 9, 66, 67.) "All acts within the powers of a corporation may be performed by agents of its own selection." (*Barnes* v. *Ontario Bank*, 19 N. Y., 158.) Mr. Wilson was clearly invested with power to make the bill. He was the president of the company, not only *de facto*, but *de jure*. He was properly elected in January, 1839, and, without any special provision in the charter to that effect, would have held over until another president was elected (Strange, 625; 10 Mod., 146; 9 Johns., 158); and the fourth section of the charter expressly provides, that the officers elected by the stockholders, among which is the president, "shall continue in office for one year, and until others are chosen." He had not removed to New York when he made the bill, and it is therefore unnecessary to consider what effect such removal had upon his powers or tenure of office. By virtue of his office, if nothing further appeared in regard to his powers, I think he would not have been authorized to purchase the locomotive, or to execute the bill. Those were duties which belonged to the board of managers, and could only be conferred upon other officers or agents with their consent. (*McCullough* v. *Moss*, 5 Denio, 575; *Hoyt* v. *Thompson*, 1 Seld., 320.)

The managers, prior to the 2d of April, 1838, appointed an executive committee, and by a resolution of that date invested the committee, so far as their act could do it, during the intervals between the meetings of the board, with "the full powers of the board to act for, and to bind the company." That committee, in October, 1839, authorized the president to

purchase a locomotive and tender, and to give the notes of the company for them; and also "to act in all the ordinary business of the company as fully as the committee." might do. It does not appear that these powers were ever recalled; and if neither the board of managers nor the committee were acting beyond the scope of their own authority, the president had the express warrant of the corporation for everything which he did. The managers might, undoubtedly, clothe a committee, in the intervals between the sittings of the board, with all their own authority to conduct the ordinary business of the company (*Hoyt* v. *Thompson's Executor*, 19 N. Y., 207-216); but it does not follow that the committee could delegate that power to one of their number. I doubt their authority to do so, as they had no express power of substitution; but it is unnecessary to pass upon that question, as there is another ground on which the power of the president to bind the company must be sustained. The board of managers, designedly, as it must be presumed, relinquished to the president, for a period of three years (embracing the time of all the transactions involved in the present actions), the exclusive management of the business of the corporation; allowing him, at his own discretion, to employ and pay the workmen constructing the road; to purchase and lay the iron constituting the track; to borrow money in large and small sums, giving the notes or bills of the corporation therefor, as well as other securities; to purchase locomotives and cars, and to put them in use on the road, paying for them in like bills and notes; and when, at the end of the three years, the managers again resumed the discharge of their appropriate duties, they took possession of the road and of all the property thus procured by the president, and continued to use such property for several years, without question as to the manner in which it had been obtained. Under such circumstances, the acts of the assumed agent cannot be repudiated: The powers of the agent of a corporation are such as he is allowed by the directors or managers of the corporation to exercise within the limits of the charter; and the silent acquiescence of the directors or man-

agers may be as effectual to clothe the agent with power as an express letter of attorney. Judge STORY says, in *Bank of United States* v. *Dandridge* (12 Wheat., 64): "If officers of a corporation openly exercise a power which presupposes a delegated authority for the purpose, and other corporate acts show that the corporation must have contemplated the legal existence of such authority, the acts of such officers shall be deemed rightful, and the delegated authority will be presumed." This doctrine has often been confirmed (*Melledge* v. *The Boston Iron Co.*, 5 Cush., 175; *Bridenbecker* v. *Lowell*, 32 Barb., 18; *Perkins* v. *Washington Ins. Co.*, 4 Cow., 645, 659, 661; *Hoyt* v. *Thompson's Executor*, 19 N. Y., 208, 219; Ang. & Ames on Corp., 3d ed., 269); and, applied to the present case, shows that the authority of Wilson cannot now be denied.

But it is insisted that the bill purports on its face to be the bill of Wilson, and not of the defendant, and does not, therefore, bind the defendant. The evidence shows that it was drawn for the debt of the company, by an agent authorized to draw it, and, according to well-settled rules, the company is bound by it, if, upon the whole instrument, it can be collected that such was the intention. (Story on Agency, § 154; *Rathbone* v. *Budlong*, 15 Johns., 1; *Many* v. *Beekman Iron Co.*, 9 Paige, 189; *Safford* v. *Wyckoff*, 1 Hill, 11; *S. C.*, 4 id., 442; *Fuller* v. *Hooper*, 3 Gray, 334.) There was clearly sufficient upon the face of the bill to indicate an intention to bind the company. In this respect the case cannot be distinguished from those of *Safford* v. *Wyckoff*, and *Fuller* v. *Hooper* (*supra*). The defendant's counsel claims that the contract for building the locomotive was not binding on the company, and that for that reason the president had no right to execute the bill on behalf of the company. Two grounds are relied upon to sustain this position: 1. That the contract was, on its face, the private contract of Wilson and Bostwick; and, 2. That the defendants had no power to make the contract jointly with the New York company, and that it could not, therefore, bind them. The first ground is answered by what is said in regard to the bill. The evidence is equally as clear on the face of the

contract, as it is on the face of the bill, that it was made for the corporation. In regard to the other ground, I think the companies, if there were nothing special on the subject in their charters, would have been authorized to make the arrangement which existed between them, for a joint ownership of locomotives to run over both their roads. (4 Seld., 37; 14 Barb., 471; 24 id., 382; 29 id., 56, 57; 6 Gray, 539; Redfield on Railways, pp. 281, 287, §§ 135, 136.) But whether that would be so or not, the supplement to the defendant's charter, passed in 1835, providing for the connection of their road "with the Chemung canal by railroad, canal or slackwater navigation," would justify them in making that arrangement.

The defendant's counsel excepted to rulings of the referee, allowing the president of the company to testify that on various occasions, both before and after the date of the bill in question, he made drafts and promissory notes in the name of the company; that they were honored, and that the amounts entered into the accounts of the company. I think this evidence was admissible. The cases above referred to show that the limits of an agent's authority may be determined by the power which he is allowed to exercise, and that silent acquiescence of the principal may be equivalent to express assent. In other words, that the authority may be shown by circumstances. The recognition by a corporation of acts on the part of an agent, similar in character to those which may be in dispute, tends strongly to establish the agent's authority. (15 Johns., 54; 1 Hill, 501; 4 Seld., 160.) It does not appear that the board of managers had any direct agency in the payment of the bills or notes made by the president, and it is a fair presumption, from the manner in which all the business was done, that the payments were made by the president, without any communication at the time with the other officers or the managers of the company, and if nothing further appeared, such payments would have been circumstances of no importance; but the subsequent rendering of accounts to the board of managers, containing entries of such payments, unobjected to on the part of the board, affords a strong pre-

sumption of a ratification of those acts. At all events, such evidence could not be rejected, even if its bearing should be regarded as slight or remote.

It is insisted that evidence of the making of bills and notes subsequent to the date of the bill in suit, was specially objectionable; but I think the authority to make the bill might be shown by the approval of similar acts after as well as before the bill was drawn. The proof related to a continuous series of acts, embracing the time of the act in contrnversy, and was, all of it, competent as bearing upon the authority to perform that act. The objection goes to the weight and not to the admissibility of the evidence; later acts might be less decisive than prior ones, but evidence of them could not properly be excluded.

Exceptions were also taken to testimony showing that the transactions and financial affairs of the company during the presidency of Mr. Wilson, his making of loans, purchasing property and giving negotiable paper for the company, were the subject of conversation at the meeting of the board of managers, in February, 1841. What took place before the board of managers, when engaged in the business of the company, in regard to the doings of the president, was undoubtedly admissible, as notice to the corporation of the powers which its officer was exercising. Notice to the board was notice to the corporation. (19 N. Y., 216.) It is, however, insisted that the evidence excepted to related to conversations with individual members of the board, which would doubtless have been inadmissible; but the case does not admit of that interpretation, especially as it appears that the referee had, before this testimony was offered, refused to hear evidence of such conversations.

These are all the objections which are made to the judgment upon the bill of exchange, and I think none of them are such as to require its reversal.

In the second case it appears that, in the fall of 1841, the Arbon Coal Company, being indebted to the defendants for freights upon coals carried over the defendants'·road, to an amount exceeding the amount of the notes which form the

subject of the suit, made the notes payable to the defendants' order, and delivered them to Mr. Wilson, their president, to enable them to raise money to meet their accruing liabilities. No specific application was made of the notes upon the indebtedness of the coal company, nor is it shown that any particular arrangement was made as to the manner in which they should be accounted for by the defendant.

Mr. Wilson indorsed the notes in the name of the defendants, and, with the aid of Mr. Bostwick, one of his associates on the executive committee, procured them to be discounted in behalf of the defendants. What became of the money, does not appear.

It is insisted, on the part of the defendants, that the indorsement of the notes was made for the accommodation of the Arbon Coal Company, and was, therefore, not binding upon them. It is a sufficient answer to this position to say, that the referee has not so found the fact, and that the burden of proof upon that point, if the defendants relied upon it, rested with them. I have, however, discovered nothing in the evidence which tends to show that the indorsements were made for the accommodation of the coal company. If the notes were given to apply on the indebtedness of that company for freights, they became the property of the defendants, and in transferring them, they occupied the position of ordinary indorsers transferring business paper. If they were not to apply on the indebtedness of the coal company, then they would appear to have been made for the accommodation of the defendants, and, after their discount, the defendants were the principal debtors and the Arbon Coal Company their sureties. Neither view can aid the defendants, and no other view is admissible, in the absence of evidence that the coal company received the avails of the notes.

If the right of the defendants to borrow notes admits of question (1 Sandf. S. C., 53; 15 N. Y., 219), we should be bound, in support of the judgment, to presume that the referee found the notes to have been given on account of the

indebtedness, inasmuch as there was evidence from which he might have so found. (21 N. Y., 551, 552; 22 id., 324.)

The question which is made as to the authority of Wilson to bind the corporation by his indorsements of the notes, is governed by the same principles as that in regard to his right to make the draft, which has already been considered and decided in the other case, and must receive in this the same determination.

With some hesitation, I have come to the conclusion that the evidence of the service of notice of protest was sufficient. The statute contemplates but a single certificate as evidence of the presentment of a note or bill for payment, its protest, and the giving of notice of its dishonor. The language of the statute is this: "The certificate of a notary, under his hand and seal of office, of the presentment by him of any promissory note or bill of exchange for acceptance or payment, and of any protest of such bill or note for non-acceptance or non-payment, and of the service of notice thereof on any or all of the parties," &c., "shall be presumptive evidence of the facts contained in such certificate." (3 R. S., 5th ed., 474.) The notary may undoubtedly certify to each of the acts separately, but he may also, by one certificate, verify them all. If the certificate be "under his hand and seal of office," it is sufficient, and it cannot be of any importance where the seal is affixed. It may be at the beginning, at the end, or anywhere upon the margin, or it might be appended by a ribbon, after the manner of the sealing of ancient charters. The officer is not required to certify to the sealing, but it is sufficient if the seal be, in fact, affixed, and the name signed. Unquestionably, therefore, if the seal had been placed where it is, and the signature only at the bottom of the last part of the certificate, the whole would have been sufficiently verified. I do not think it is any the less so by reason of the words, " *In testimonium veritatis*," with the signature opposite the seal, between the two parts of the certificate. The whole may, with propriety, be regarded as one certificate, once sealed and twice signed. I adopt this conclusion the more readily, because the objection is merely

formal, the certificate, in its present form, furnishing all the security against error, and imposing upon the notary all the responsibility which it could do if another seal were added. A single private seal has often been held to bind several parties (*Mackay* v. *Bloodgood*, 9 Johns., 285; *Van Alstyne* v. *Van Slyck*, 10 Barb., 387); a seal in the space between the penal part of a bond and its condition, makes the condition a part of the sealed instrument (*Reed* v. *Drake*, 7 Wend., 345); conditions of insurance annexed to a policy are regarded as a part of the policy (*Roberts* v. *The Chenango Mut. Ins. Co.*, 3 Hill, 501); and a seal at the foot of a deed, absolute on its face, is applicable to a defeasance indorsed upon the back of the deed, without date or signature. (*Stocking* v. *Fairchild*, 5 Pick., 181; *Emerson* v. *Murray*, 4 N. H., 171. The case, however, most nearly resembling the present, of any to which our attention has been called, is that of *The State* v. *Coyle* (33 Maine, 427). In that case a complaint and justice's warrant in pursuance of it, were written on the same piece of paper, and the only seal was at the end of the justice's signature to the complaint, the warrant being written beneath it. It was held that the warrant was sufficiently sealed. These authorities, particularly the last, justify the admission of the certificate of the notary, especially as such certificate furnishes presumptive proof only of the facts contained in it, concluding neither of the parties.

The evidence which was offered, as to the value of the property mortgaged by the Arbon Coal Company to Ketchum, as security for the payment of the notes in suit and other demands, was properly excluded. The mortgage contained a provision that, in case default should be made in the payment of the sum which it was made to secure, the mortgagee might take immediate possession of the property, and, after giving reasonable notice, might expose the same to sale at public vendue to the highest bidder, and apply the proceeds of such sale towards the payment of said sum and the interest, rendering the surplus, if any, to the said Arbon Coal Company. In pursuance of this power the property was sold at auction in August, 1843, and all, or the greater part of it, bid off by

Mr. Ketchum, the mortgagee, for the benefit of the creditors whose demands the mortgage was intended to secure. It was not attempted to be shown that the sale was not conducted in good faith, or that reasonable notice was not given, according to the terms of the mortgage; but it was insisted that the trustee could not purchase for his own use, or for the use of the creditors of the mortgagor, at the sale conducted under his direction, and that, consequently, the right of the parties remained the same as if the mortgagee had taken and retained possession of the property, without a sale. If that was the correct view of the position of the parties, the defendants were entitled to the benefit of the proof which they offered, as in such case the mortgagee would be chargeable with the value of the property, to be applied in the reduction of the amount due on the mortgage. (*Spencer* v. *Harford*, 4 Wend., 385, 387; *Morgan* v. *Plumb*, 9 id., 292; *Case* v. *Boughton*, 11 id., 106; *Carter* v. *Stevens*, 3 Denio, 35; *Craig* v. *Tappen*, 2 Sandf. Ch., 88.) Ketchum was a trustee of the mortgagor, as well as of the creditors whose demands were secured by the mortgage. In his character of trustee, he owed to all those parties the duty of so managing the sale as to obtain the highest price which the property would bring. Under such circumstances, if he occupied that character only, he could not become a purchaser for his own benefit. A trustee or agent will not be allowed to assume a position in which his interest will come in conflict with his duty (*Davoue* v. *Fanning*, 2 Johns. Ch., 252; *De Caters* v. *Chaumont*, 3 Paige, 179; *Van Epps* v. *Van Epps*, 9 id., 238; *Iddings* v. *Bruen*, 4 Sandf. Ch., 223–263; *Moore* v. *Moore*, 1 Seld., 256); and this rule is equally applicable to transactions in real, and in personal estate. (*Cook* v. *Collingridge*, Jacob, 607; *Wedderburn* v. *Wedderburn*, 2 Kern., 731; *Hall* v. *Hallett*, 1 Cox, 134; *Anon.*, 1 Salk., 155; *Ames* v. *Downing*, 1 Bradf., 321; White & Tudor's L. C., 111.) As trustee, merely, he would be equally prohibited from purchasing for the benefit of a part of those interested in the sale. (3 Paige, 178.) He was, however, a creditor, whose demand, in common with others, was secured by the mortgage, and his purchase was made in behalf of all

such creditors. If, in any case, a mortgagee of chattels, selling them at auction in pursuance of a power of sale contained in the mortgage, can become the purchaser of the mortgaged property and hold it discharged from any right of redemption, the purchase by Ketchum was effectual for that purpose. It has, if I am not in error, been generally supposed that the power of sale, given to a mortgagee of chattels, whether given expressly, or left to be implied by law, authorized the mortgagee to purchase the property, at a fair sale under such power, for his own use; that express notice to the mortgagor which is required to make the foreclosure effectual (*Hart* v. *Ten Eyck*, 2 Johns. Ch., 100; *Patchin* v. *Pierce*, 12 Wend., 63; *Charter* v. *Stevens*, 3 Denio, 35,) came in place of a decree authorizing the parties to purchase; and that persons having such notice were bound to attend and protect their interests by bidding, if protection were necessary. (*Bergen* v. *Bennett*, 1 Caines' Cases, 1–14–19; *Slee* v. *The Manhattan Company*, 1 Paige, 52–74.)

A different opinion was expressed in the case of *The Buffalo Steam Engine Works* v. *The Sun Mutual Insurance Company* (17 N. Y., 401); but the case was disposed of on other grounds, and the point still remains undetermined. The inconvenience and expense of a resort to the equity powers of courts to effect such foreclosures, which would be the probable consequence of denying to mortgagees the right to purchase, might be productive of greater oppression to mortgagors than could result from maintaining that right. Unfortunately, injustice cannot always be prevented by subjecting sales to the direct control of courts, and such control should not be assumed unless experience has demonstrated its necessity. The practice has prevailed in this state from a very early day of allowing mortgagees to become purchasers at sales conducted by them, under powers contained in mortgages of real estate; and that course was sanctioned by a statute passed in 1808, in consequence of a doubt having been expressed in the Court for the Correction of Errors, as to the validity of such purchases. (1 Paige, 73; 1 Caines Cas., 3–19; 2 R. S., 546, § 7.)

The long continuance of this practice, and the approbation which it has received from the legislature, afford strong evidence that no great inconvenience or injustice arises from it; and it is not perceived why a similar course, in sales under mortgages of chattels, would be attended with greater danger. It is unnecessary, however, in the present case, to decide this question, as there are other grounds upon which the purchase by Ketchum must be sustained. A purchase of trust property by a trustee at public sale, has always been held valid at law, and is voidable only and not void in equity. It is voidable only at the election of the persons whose interests are affected by the purchase. (*Jackson* v. *Van Dalfson*, 5 Johns., 47; *Jackson* v. *Walsh*, 14 id., 207; *Wilson* v. *Troup*, 2 Cow., 196–238; *Mackintosh* v. *Barber*, 8 Eng. C. L., 1st ed., 247; *Campbell* v. *Walker*, 5 Ves., 678, and note *a*, Sumner's ed.; *Whichcote* v. *Lawrence*, 3 Ves., 740, note *a*.) The defendants here are not competent to make that election. The mortgagor (The Arbon Coal Company) is the party most directly interested in the question, and the validity of the sale cannot be impeached without its consent, or at least without giving it an opportunity to be heard. (*Davoue* v. *Fanning*, 2 Johns. Ch., 267, 268; *Munro* v. *Allaire*, 2 Caines Cas., 194; *Whelpdale* v. *Cookson*, 1 Ves., Sen., 9; *S. C.*, 5 Ves., 682; *Harrington* v. *Brown*, 5 Pick., 519.) The proper parties not being before the court, the question which it was the design of the defendants, by the evidence offered, to present, could not be considered, and the evidence was properly rejected. Possibly, the delay which had occurred since the sale would, of itself, as was claimed by the plaintiff's counsel, have justified the exclusion of the evidence (*Hawley* v. *Cramer*, 4 Cow., 718–743); but there are equitable considerations on the other side bearing upon that question, and I express no opinion upon it, the other ground being entirely sufficient to justify the decision of the referee. The judgment of the Supreme Court in both cases should be affirmed.

All the judges concurring,

Judgment affirmed.