THE MECHANICS' BANK, Respondent, v. ORLEANA C. SCHAUMBURG AND MARTHA ANN WILLS, Appellants.

1. *Agent—Power—Evidence.*— Where an express authority is given in writing by the principal to the agent, another or different authority cannot be implied. The extent of the authority is to be ascertained from the instrument itself, and it cannot be enlarged by parol evidence.

2. *Agent—Power.*—A power of attorney given by a principal to his agent, to execute, sign, draw and endorse notes and bills in the business of the principal, will not import an implied authority to use the name of the principal in joint transactions with other persons and for their benefit.

3. *Corporations — Notice — Evidence.*—The knowledge acquired by the officers of a corporation while in the discharge of their official duties, is the knowledge of the corporation itself.

4. *Agent—Power—Corporation.*—A. gave W. a power of attorney, in her name, to borrow money, draw, sign and endorse bills and notes, and to execute deeds, &c. B. also gave W. a similar power. W., who was president of the bank, and kept an account with it in his own name, presented these powers to the bank as his authority to sign the names of A. and B. to joint notes, the proceeds of which notes went to W., of which the bank had notice. *Held,* that as the officers of the bank had, by the powers of attorney, notice of the extent of W.'s authority, the notes were not given in pursuance of the authority, and that the bank had notice of the want of power.

*Appeal from St. Louis Common Pleas Court.*

*Sharp & Broadhead, Glover & Shepley,* and *Holliday,* for appellants.

I. Notice to the president was notice to the bank; or to state the proposition more broadly, the fraud of the president, in matters which came within the line of his business as an officer of the bank, was the fraud of the bank.

It was to the interest of the bank to secure the debt due by Wills to the corporation. It was the duty of the president, in his general surveillance of the affairs of the bank, to see that all debts due the bank were secured, and if, in at-

tempting this, he practised a fraud upon the defendants, it is the fraud of the bank, because it is done by its own trusted officer, for its benefit and advantage.

A bank is liable for the fraud or mistakes of its cashier or clerk in the entries in its books, &c.; and generally, as natural persons are liable for the wrongful acts and neglects of their servants and agents done in the course and within the scope of their employment, so are corporations, upon the same ground, in the same manner, and to the same extent—Ang. Corp. 302–3.

Corporations can only act through their agents. If notice can be brought to the bank at all, it must be, and can only be, through the agents of the bank. It is contended that the directors having the general control of the business of the bank, the notice must be to the directors in order to make it binding on the bank. The president was the head of the directory; but he was more than that: he was empowered by the rules and by-laws of the corporation to exercise a general supervision "over all the affairs of the bank." It would be a monstrous proposition to say that the bank is not bound by his knowledge as well as his acts.

"It is well settled, that notice to an agent of a party whose duty it is as such agent to act upon the notice, or to communicate the information to the principal, in the proper discharge of his trust as such agent, is legal notice to the principal; and this rule applies to the agents of corporations as well as others"—Fulton Bk. v. N. Y. & S. Canal Co., 4 Pai. 137; Boyd v. Chesapeake & O. Canal Co., 17 Md. 195.

One of the grounds for charging the principal with knowledge possessed by the agent is, because the latter is bound to communicate the fact to the former, and is liable for any prejudice that may arise from a neglect in this respect; and hence the law presumes that the principal has had actual notice—Bk. of U. S. v. Davis, 2 Hill, 464; Sandford v. Handy, 23 Wend. 260.

II. But, in the absence of any question of fraud, it is sub-

mitted that the plaintiff has never complied with its contract with the defendants.

The agreement on the part of the bank was, that it would lend the money on the notes secured by deeds of trust on land. The notes were given not for money advanced, but to be advanced by the bank. The defendants complied with the contract on their part; but the fact was that the Bank never did comply with its part of the contract; it never paid the money to the defendants.

The facts as they appear by the record show that the directors knew that the money was wanted for the defendants; that they agreed to let the defendants have it; that the money was then placed to the credit of the cashier, to whose order the notes were made payable, to be checked out by him for the parties asking the discount; that he, instead of giving the defendants a check for the money, gave the check in the name of John W. Wills, and placed the amount to his individual credit, although he knew, and the directors knew, and the president (Mr. Wills) knew, that the money was not intended for him, but for the defendants. The cashier was the agent of the bank specially entrusted with the business of paying over the money to the parties in whose favor the discount had been ordered. If he failed to obey his orders, or discharge his duties, it is certainly not the fault of the defendants. The notes are evidence of an executory, not an executed contract. It could only be executed, and the contract made binding upon the defendants, by the payment of the money to them.

It may be answered that it was paid to their agent for them; but this is not true, because it was paid to the agent for his own use, and placed to his individual credit; and this by the act of Wills and the cashier. The act of the cashier was the act of the bank—Foster et al. v. Essex Bk., 17 Mass. 496. If the cashier could pay the money to Wills, he could pay it to any one else, a perfect stranger to the transaction, and the defendants could be held on notes for which they re ceived no consideration whatever.

The declarations of Wills as to his purposes, and as to the disposition he made of the money, are not to be taken as any evidence against the defendants. It is true, he was the agent of defendants, as he was also the agent of the bank. But what he said in his own interest, and in reference to his own affairs, are not to be taken as evidence against any one but himself. No principle is better settled in the law of agency than this—Sto. Ag. 156 et seq.

III. The power of attorney to Wills did not authorize him to make the notes sued on: they are joint notes; that is, each defendant is jointly as well as severally bound for the whole debt, according to the face of the notes. The powers of attorney are separate, and there is no authority vested in Wills by either one of the instruments to bind one of the defendants for the debt of the other, to make one security for the other, or to involve either one in liabilities other than those which related to her own business. The evidence shows that their accounts were kept separate; their property was separate.

*Cline & Jamieson,* for respondent.

I. Notice can alone affect or even reach the principal, when the knowledge is brought home to, or at least possessed by, the agent when he is in the actual performance of some act or duty for and in behalf of his principal, and must be concerning the business in which the agent is then engaged— Ang. & A. Corp. § 307; Washington Bk. v. Lewis, 22 Pick. 24; Bk. of Pittsburg v. Whitehead, 10 Watts, 397; Caster v. Tompkins Co. Bk., 9 Barr., Pa., 27; Farrell Foundry v. Dart, 26 Conn. 376; Farmers' & Cit. Bk. v. Payne, 25 Conn. 448; Gen. Ins. Co. v. U. S. Ins. Co., 10 Md. 517.

It is a principle universally admitted, that in all cases where an officer of a corporation acts for himself and not for the company in any given transaction, his knowledge or fraudulent purposes can in no case affect the corporation, unless communicated to its managing agent at the time of the transaction, or at least prior thereto, because in all such cases the

officer deals with the corporation as though he had no connection with it, and becomes the contracting party on one side, while the corporation is the contracting party on the other. It would indeed be a strange fiction of the law, calculated to work ruinous consequences to corporations, if the knowledge and fraudulent purposes of a president or cashier, locked up in their own breasts, are, under the circumstances, to be deemed as constructively known to the corporation at the time it deals with them—Ang. & A. Corp., 7th ed., § 308; Seneca Co. Bk. v. Neass, 5 Denio, 337; Winchester v. Balt. & Susq. Co., 4 Md. 231.

Neither the acts nor the knowledge of the officer of a corporation will bind it in a matter in which he acts for himself, and deals with the corporation as if he had no official relation therewith.

In order to affect a company by reason of the knowledge of one of its directors of a fact, it is necessary that he should have such knowledge of such facts while acting officially in the business of the corporation and in behalf of the company—Farrell Foundry v. Dart, 26 Conn. 376. Therefore, when a defective deed had been recorded, and one of the directors went to the office to see the condition of the property, and was not charged with the business in any way, except that he was a director, and never communicated the fact to any one of the company's agents, it was not notice to the corporation.

II. Notice which a director of an insurance company receives privately, or by rumor, and does not communicate to the board, is not binding on the company—Gen. Ins. Co. v. U. S. Ins. Co., 10 Md. 517.

If a director of a bank is acting in behalf of the bank in a transaction, notice at the time to such director of any fact material to the transaction is notice to the bank—Smith v. South Royalton Bk., 32 Vt. (3 Shaw), 341; Hoffman & Co. v. Cumberland Ins. Co., 16 Md. 456. In this case, the law of notice is reviewed, and many former leading cases on that subject referred to and discussed.

The knowledge of a director of a bank as to the object for which certain bills were delivered to a party applying to a bank for a discount thereof, such director not being present at a meeting of the directors at which such application was made and such bill discounted, and not having communicated his knowledge to any other director or officer of the bank, is not to be regarded as notice to the bank—Farmers & Cit. Bk. v. Payne, 25 Conn. 444; Ang. & A. Corp. §§ 306, 308; 22 Pick. 24; 24 Pick. 270.; 3 Day, 491; 11 Conn. 388; 13 Conn. 173; 22 Conn. 335; 1 Hill, 578; 3 Hill, 274.

For further authority on the question of notice to corporations through agents and officers, we refer the court to the following authorities: Bank v. Whitehead, 10 Watts, 397; Ewing v. Montgomery Co. Ins. Co., 5 Hill, 101; Como v. Port Henry Ins. Co., 12 Barb., 27; Cumberland Coal Co. v. Sherman, 20 Barb. 553; Trenton Banking Co. v. Woodruff, 1 Green, N. J., 115; 27 Eng. Law & Eq. 140; U. S. Ins. Co. v. Scheeren, 3 Md. Ch. Dec. 381; Gen. Ins. Co. v. U. S. Ins. Co., 10 Me. 517; 24 Pick. 270; 3 Hill, 274–5; Ang. & A. Corp. § 247; Manhattan Co. v. Tydig, 4 Johns. 337.

HOLMES, Judge, delivered the opinion of the court.

The case is presented here mainly upon questions arising upon the instructions. In order to determine these matters, it will be necessary to consider the state of facts and the nature of the case upon which the ruling of the court below was predicated. The most material facts may be stated sufficiently for all the purposes of a decision on the points raised, nearly as follows:

John W. Wills, president of the Mechanics' Bank, had been also acting as the agent and attorney in fact of Orleana C. Schaumburg, and of Martha A. Wills, for several years, under separate and distinct letters of attorney under seal, severally executed by them, each giving to the attorney in fact full power to represent the principal in her business, and for her use and in her name to sell and convey, or to purchase real estate or slaves, and in her name and for her use to bor-

row money and execute notes and deeds of trust to secure the same upon all her property; and to execute promissory notes either as principal or endorser, and to check for money and draw bills of exchange on any banking-house or corporation in St. Louis or elsewhere in the United States; and to lease real estate, collect moneys due on notes, accounts, mortgages or otherwise, and do any and all other acts and things in and about her business. John W. Wills kept his individual account at the Mechanics' Bank. No account was kept there by either of the defendants in her own name, or that of her agent. The transactions of the agent on account of either principal were large and various, and he mixed the moneys of his principals with his own in his individual account at the bank. On the 22d day of August, 1862, his account at the bank stood overdrawn to the amount of forty thousand five hundred dollars and upwards. This fact was known to himself as president, to the cashier, and to the teller, but was not shown to have come to the actual knowledge of the board of directors. At the same time, the bank held notes of the defendants, which had been discounted, to the amount of $25,000. On that day, John W. Wills, vacating for the time his seat as president of the board, and acting in his character as agent, laid before the board of directors an application, in the joint names of the two principals, for a discount of three notes of twenty thousand dollars each, and on the 29th of August following two other notes for ten and fifteen thousand dollars, making in all $85,000; submitting also his letters of attorney, and stating that the loan was asked for the use and benefit of the defendants, and offering to deposit other notes secured by deeds of trust, to be executed by him as attorney in fact, on the real estate of both his principals. The notes presented for discount were drawn and signed by the attorney in fact, in the names of the defendants as makers, payable to "Charles Everts, cashier," and were endorsed by no one but the cashier; and when passed at the board, and when the collaterals had been satisfactorily executed and deposited, the money was placed to

the credit of the cashier, who drew his checks for the amounts in favor of John W. Wills, who immediately endorsed them to the bank as a deposit on his individual account. The defendants were then living here in the city: they had never been consulted on the subject, and knew nothing of the transaction until the spring of 1863, a short time before the commencement of this suit.

The record shows also that evidence was given by the defendants, tending to prove that the agent, at the time of these discounts, had money enough of each of his principals in his hands to have paid the indebtedness of either of them, and that the proceeds of these discounts did not go to the benefit of either of them, and that the business and property of each was separate, and that they had no joint property or joint business; and the plaintiff, in rebuttal, gave evidence tending to prove the direct contrary of these facts, and also that a large amount of the business of the defendants was conducted and managed jointly by the agent, and that he drew notes and bills jointly in their names, signing the name of one as maker and that of the other as endorser, and that the moneys so raised were used for their benefit; and further, that during the period of the agency the defendants sometimes raised money on paper drawn by one and endorsed by the other, and that sometimes the agent Wills executed notes in the same way in their names, and raised money on them.

The charter did not authorize the bank to make discounts or loans on real estate security. The statute authorized the taking of real estate in payment of debts previously contracted in good faith, and the purchase of real estate under judgments and decrees in order to secure debts due the bank. The by-laws, among other things, provided that discounts made should be placed to the credit of the applicant; that accounts overdrawn should be reported to the board of directors on every discount day, and that no overdrawer should have a note or bill discounted at the bank; and it was specially made the duty of the president to have a general surveillance of all the affairs of the bank; and of the cashier, to

ascertain, by personal examination at the close of each day's business, that the cash balance of each teller was correctly stated.

The respective letters of attorney gave a general authority in the particular business named in each, but by no means a universal authority or an unlimited power. The power was confined to the individual business of the principal, and to transactions in her name and for her use, and in her business only. It did not extend to the business of any other person, whether that of the agent individually, or of a stranger, or of any third person ; nor did it extend to any interest in a partnership business or a joint adventure. The authority cannot be extended beyond that which is given by the terms of the instrument, and must be limited to acts which were within the scope of the particular business to which they relate. The power given here to borrow money, draw and endorse notes, and execute deeds, was limited to the extent of the principal's individual business, and did not authorize the drawing and endorsing of notes, the making of loans, or the execution of deeds of trust to secure them, for the accommodation of a stranger, or for the benefit and use of the agent individually, or of any other person—Sto. Ag. §§ 66, 69. The application to the bank for this loan was made under these letters of attorney. The board of directors was bound to look to them for the extent of the agent's authority, and were put upon inquiry to ascertain, by all reasonable precaution and prudence, whether these instruments justified his acts. The extent of the authority was to be ascertained from the instrument itself, and it cannot be enlarged by parol evidence of any previous usage in transactions with other persons, or of an intention to confer powers additional to those contained in the instrument, or in any way to vary, control or contradict the terms of the written instrument. Evidence of a previous course of dealing between the same parties, under these letters of attorney, might have been admissible to interpret any ambiguity in the writing itself, and to explain the understanding of the parties as to the powers actually

given—Sto. Ag. §§ 76, 77.  Or, if there had been any previous declarations or conduct of the principals themselves toward the plaintiff, in respect to this transaction, or in any previous course of dealing between them and the plaintiff, through their agent or otherwise, which could have fairly led the directors to believe that they had in fact given to the agent more extensive powers than were conferred by the instrument alone, the defendants might have been held bound by such declarations and conduct, on the basis of a new authority given.   There was nothing of the kind in this case. These letters of attorney were laid before the board, with the application, as containing the authority under which he was acting.

It is a familiar principle that the agency of a partner as such does not give him an implied authority to sign the name of the firm as security in the business of another.   There must be a special authority for that.   In like manner, a power given .to be co-extensive with one's .individual business, will not import an implied authority to sign his name as security in a partnership business, or in a joint adventure with other persons ; for that is another and a different business.   It does not fall within the scope of such a power.   For such acts there must be additional authority ; which, however, may sometimes in a proper case be implied and gathered from a previous course of dealing between the same parties.   No such basis was shown here for any such additional powers in this transaction.   The previous dealings of John W. Wills with the bank, in his individual capacity, did not furnish it ; nor can his dealings as their agent with other persons, on previous occasions, in other matters, be admitted to extend the authority given by the letters of attorney on which this negotiation was predicated.  His principals may have been willing to give him a more ample power in other instances, but not in this.   Formal instruments of this kind are subject to strict interpretation, and the authority is not to be extended beyond that which is given in terms, or which may be necessary and proper to carry the given power

into full effect. The general rule, admitting of but few exceptions (of which this case is not one), is, that where an express authority in writing is given, an implied authority cannot take place. *Expressum facit cessare tacitum*—Sto. Ag. §§ 68, 76, 83; Atwood v. Mannings, 7 B. & Cress. 278; Rossiter v. Rossiter, 8 Wend. 494; Paley on Ag. 102.

Touching the evidence given by the plaintiff in relation to the mode in which this agent had previously managed and conducted the business of his principals, or they their own business, it may observed that it is not stated that any of these transactions were had with this plaintiff, nor that they were done under these written powers alone, and not under any additional powers, verbal or written; nor that they were ever recognized by the principals as having been done strictly within the authority intended to be conferred by these instruments. Nor does it appear that the agent himself, at the time when he laid this application before the board of directors, made any declarations of further authority which might be considered a part of the *res gestæ*, or claimed any greater powers than those conferred by the instruments submitted to them; nor that the directors acted upon any such declarations, or upon any previous conduct of the principals in any dealings with the bank, or upon any powers supposed to have been given by the defendants beyond what was contained in them. This evidence, then, cannot be allowed to have any effect on the decision of the case.

The next question is whether these discounts were made in pursuance of the powers given by these letters of attorney. The application made was for a loan to these defendants jointly. The notes were signed with their names as makers by the attorney in fact. They were drawn payable to the cashier of the bank. There was no endorser. The loan was to be on the credit of the makers only. Even that was not relied upon; but other notes to be drawn in like manner, and secured by deeds of trust on the real estate of both principals, to be executed also by the attorney in fact, were to be deposited as collateral security. The notes were passed by

the board on this condition. When all this had been finally arranged, the money was placed to the credit of the cashier of the bank, and not to the credit of these defendants, nor of John W. Wills, as their agent, jointly or severally. The cashier's check that drew the money from the bank was drawn payable to John W. Wills individually, was endorsed by him on the spot, and placed to the credit of his individual account at the bank. The money did not go to these defendants, nor to their agent, as such. The directors knew how these notes were drawn, and they left the transaction to be carried into effect and completed by the president, the vice-president, the cashier, and the tellers. The acts of these officers in their several capacities were the acts of the bank. Their knowledge, acquired in the course of their official duties as such officers, was the knowledge of the bank; and they knew that this money went directly to the individual account of John W. Wills, and that it was never put under the control of these defendants, nor of their agent in that capacity. The directors and the bank knew that these letters of attorney only authorized such a loan to be made in their names, and for their use, and in their several business. Here the loan is actually made to John W. Wills, in his name, for his use, and in his business. We think the transaction was clearly beyond the scope of the authority given, and that the bank must be deemed to have had knowledge of the fact.

Now, if this money had been placed to the credit of these several defendants, to be drawn by their checks in person, or by the checks of their authorized agent; or to the credit of John W. Wills in his character of agent of his respective principals, designated as such on the books of the bank, to be drawn by his check as agent, and he had so drawn the money and then applied it to his own individual purposes,—that would have been a breach of trust towards his principals, for which he and they alone might have been solely responsible. Nothing of this kind was done here; and no question of fraud of this nature on the principal, or of notice thereof to the plaintiff, properly arises on this transaction.

The record shows that there was evidence on the part of the defendants that they each had moneys enough in the hands of the agent to pay all demands against either of them, and that this money did not go to the benefit of either ; and on the part of the plaintiff, that the agent had not such moneys in his hands, and that the avails of these notes did go to their use and benefit. The argument in support of that view of the law which was based upon evidence tending to establish this last proposition rested chiefly on the hypothesis that the jury might find on the evidence that John W. Wills had in fact appropriated the whole of the money so obtained to the uses and business of these several defendants, and so that the loan as made came within the scope of his authority as agent.

Some part of the testimony consisted in statements made by John W. Wills to the teller (who was the witness) by way of explanation and excuse for overdrawing his account, and to induce him to receive memorandum checks, instead of cash, to balance his account on the face of the books, to the effect that he had so overdrawn because he had required the money in the business of the defendants. These statements were not competent evidence against these defendants. Wills was then acting in his character of president of the bank, and in his individual capacity, in a transaction which did not concern the defendants. It was his duty to exercise a general surveillance over all the affairs of the bank, and to settle his own accounts with the institution. The defendants had no accounts there in person, or by agent ; and it must have been the personal influence and authority of the president, as such only, that could have induced the teller, at his instance, to violate his own duty and a by-law of the bank, at the risk of instant dismissal.

There was evidence also that some forty thousand five hundred dollars of this money went to make up the deficit of John W. Wills' overdrawn account; some twenty-five thousand dollars of it to pay off notes held by the bank against the defendants, the balance remaining at the disposal

otherwise of John W. Wills; and the plaintiff introduced Wills himself as a witness, and he testified that the overdrafts went to the use of the defendants, and none to his use, and that every dollar of this loan was used for the purpose and business of his principals.

What is the real question on this evidence? Is it the question, what disposition John W. Wills actually made of the money when he had once obtained it in this manner from the bank? or whether this were a loan made to these defendants, through their authorized agent, in such a manner as to come within the known scope of his authority, and to bind them?

These loans as made were not embraced within the powers conferred by these letters of attorney. There was no competent evidence of any other or different powers having been given. The mere appropriation of these moneys to the use and business of the defendants cannot have the effect to confer an authority to bind them by those notes and deeds where none existed otherwise or before. Neither can it prove a loan made to them, when all the other evidence distinctly shows a loan made, not to them, but to John W. Wills in his individual capacity. Going back to the time when the transaction was completed, we find that the money did not then pass out of the bank. It was shifted directly from the bank to the individual account of Wills. No check, or other paper, was signed by either of the defendants, or by the agent of either, in his capacity as such. The money was never under their control in any way. Supposing it were true that John W. Wills was, at the same time, the general agent of the deefndants in their business; that his dealings with them as such agent were large and continuous; that both they and he, as their agent, frequently signed and negotiated notes, having on them both their names, the one as maker, the other as endorser, to be used in the course of their business; that large amounts of money were constantly coming into his hands as their agent; that he kept no account of their moneys distinct from his own individual account at

any bank, and no account of his own at any bank but this one ; and that the officers of the bank were acquainted with these facts ; would that authorize the bank to make a loan of eighty-five thousand dollars, at once, to the individual John W. Wills, merely on a supposition, or a positive declaration by him, that the money so put within his individual reach, would be employed in their business, and not in his own ? We think not. When the money was thus placed in his power, he alone became responsible for the use he would make of it, and not these defendants. Not having received the money in his character of agent, no disposition which he might make of it afterwards could be a breach of trust toward them. The bank had no concern with the state of his accounts as agent with his principals, but only with the state of his individual account at the bank. Whether he would apply these funds to his account with his principals, or to his account with the bank, or with any other creditors, or to any other purposes of his own, or expend it in the business of his agencies, or in his own business, was exclusively his own affair. The principals were responsible only for his conduct and acts done within the scope of the authority given him in their business, and for any breach of trust which he might commit in respect of moneys which should come into his hands, in his character of agent for them. Independently of all question as to the actual disposition which was in fact made of these funds, to establish the principle that the defendants should be made liable here, merely on the ground that the individual was at the same time their general agent, mixing the moneys of his principals with his own in this manner, would be to put in the power of the bank, or of any third person, by co-operation and sheer connivance with the agent, to lay hold of the property and estates of his principals, without their knowledge, or any means of knowledge, and to convert them into money to be handed over to the agent in his individual capacity to do with it what he pleased, and possibly to share the plunder. There is no reason to believe there was any dishonest purpose in the bank or its officers ;

but the transaction of business in this way would necessarily open the door to fraud and knavery in dishonest persons. It would lay every principal at the mercy of his agent, and written powers would be no more protection than so much waste paper. The law can never lend its sanction to such a principle. By the very nature and character of this whole proceeding, the bank was necessarily affected with actual knowledge that this individual person was acting in the two-fold character of their president and as agent of the defendants; and that, in this transaction, he placed himself, and was placed by the bank, in a position and course of action utterly adverse and dangerous to the interests of his principals, and one that put it directly within his power to defraud both them and the bank. That such a thing cannot be done, the the law is clear—Sto. Agen., § 210; Paley Ag. (Dunlap) 10; 1 Pars. Contr. (5 ed.) 86; Florance v. Adams, 1 Rob. (La.) 556; Olcott v. R.R. Co., 27 N. Y. 565; Stainer v. Tyson, 3 Hill, 279; Bank v. Aymar, 3 Hill, 262.

The instructions were made to turn in a great measure upon questions of bad faith in the agent toward his principals, and of notice thereof to the plaintiff. There was no need of supposing any other bad faith in the agent toward his principals than that which consisted in his undertaking to effect a loan in a way and for a purpose which did not come within the scope of his written power, nor of other notice to the plaintiff than a knowledge of that fact. It is not the case of an agent exceeding his authority where the limitations on his power cannot be fully known to the person with whom he deals, nor of notice to a *bona fide* holder of negotiable paper for value and without knowledge of the circumstances of its origin and inception. The plaintiff here had full knowledge of the extent of the authority and of the origin of the paper. No powers appear to have been claimed or relied upon but those given by these instruments, and the authority given was not pursued by either party. It may be that some of the individual directors did not personally know precisely in what manner the transaction was conducted after the notes

had been conditionally passed at the board. They were all bound to know the extent of the agent's authority. They all knew the extraordinary character of this application ; that the agent was their president ; that the notes had no other names on them but those signed by him, payable to the cashier, and were conditionally passed to be secured by a deposit of collaterals based on real estate, contrary to the usual practice of the bank ; that their president and vice-president were left to superintend the execution of the affair ; that no inquiries were made of the president, and no pains taken to ascertain the knowledge or assent of the principals, though resident in the city, to a loan of such unusual magnitude ; and they were bound to know the official powers and duties of the several officers of the bank. As to what knowledge of an officer will be also notice to the bank, there has been perhaps some variety of decision ; but the general principle may be considered as well established, that any act, representation, or knowledge of any officer or agent of the corporation, officially done, made or acquired, is to be deemed the act, representation or knowledge of the corporation itself. This rule, sanctioned by very high authority, on a subject of great importance to individuals and communities, as well as to corporate bodies and their officers, would seem to be the surest and best criterion where there is one danger and one common safety. The knowledge acquired by the president, directors, cashier, and tellers, whilst engaged in the business of the bank in their official capacities, will be notice to the bank. So far as either has authority to act for the bank, his acts are the acts of the bank, and his official knowledge is the knowledge of the bank ; but mere private information obtained beyond the range of his official functions will not be deemed notice to the bank—Sto. Ag. 140, B.; Ang. Corp., § 30, B.

For all the purposes of this case, it is enough that the knowledge of the president, directors, cashier, and teller, acquired in their official capacities, was sufficient to inform the bank that the individual account of John W. Wills stood

overdrawn to an amount exceeding forty thousand five hundred dollars; that these defendants had no account at the bank; that the notes were drawn payable to the cashier; that the proceeds went to his credit, and were merely shifted to the individual account of John W. Wills (in large part to cover his default at the bank), without the least intervention of the defendants, or their agent, in his character as such; and, in short, that no loan of money was actually made at all to these defendants, but to John W. Wills individually on the notes and deeds of the defendants, executed by him alone, in violation of the authority declared on the face of the letters of attorney which they are to be deemed to have seen and known. We think this was notice enough.

As these points will probably dispose of the whole case, it is not supposed to be necessary at this time to notice other points that have been raised, nor to review the instructions more in detail.

Judgment reversed and the cause remanded. Judge Wagner concurs; Judge Lovelace absent.