DAVID BLAKE *

*v.*

THE DOMESTIC MANUFACTURING COMPANY.

ELIZA A. BLAKE et al.

*v.*

THE DOMESTIC SEWING MACHINE COMPANY et al.

[Filed September 2d, 1897.]

1. Where there is the same receiver for two corporations, one of which, as part of its assets, owns stock in the other, a creditor of the one has such interest that he may appeal from an allowance of a claim against the other.

2. A treasurer of a manufacturing corporation has no authority, by virtue of his office alone, to endorse its notes for discount or sale.

3. A person delivered to a manufacturing corporation, from time to time, large quantities of its commercial paper, which, when endorsed by the secretary of the corporation, was discounted by certain banks, and the proceeds thereof applied to the credit of the corporation. No formal authority was given the secretary to endorse the paper, but his practice of so doing was known to all the directors.—*Held*, that he made the endorsements by permission of the directors.

4. Prior to July, 1890, the secretary of a manufacturing corporation had exercised the authority of endorsing commercial paper, and thereby obtained discounts, whereby funds necessary to run the corporation were obtained. In July, 1890, a new treasurer was elected, and he was introduced in the banks where said discounts had been made, by said secretary, as having authority to make endorsements formerly made by him. From July, 1890, to May, 1893, he made a multitude of endorsements on paper like that formerly endorsed by said secretary, and during such period the directors of the corporation did nothing with a view to look into or manage its affairs. They claimed that when said treasurer was elected they understood he would put in sufficient money to do away with the need of endorsing and discounting paper as was formerly done, but less than five months thereafter the majority of them knew that he had failed to put in additional money. They had access to the corporation's books, plainly

---

* This opinion was omitted from its proper place in the report.—REP.

Blake *v.* Domestic Manufacturing Co.

showing his practice in making said endorsements, but they never examined them.—*Held*, that, though they did not know of said endorsements, they ought to have known.

5. Where the directors of a corporation acquiesce in the act of its treasurer in endorsing its paper for discount, while holding himself out to the public as having authority so to do, they thereby constitute such treasurer its general agent to make such endorsements.

6. Where a corporation's treasurer is made its general agent for the endorsement of paper, by reason of the acquiescence of its directors in numerous endorsements made by him while holding himself out to the public as having authority so to do, an endorsement made by him is binding on the corporation, though the endorsee had no knowledge of the previous endorsements.

7. Where a corporation's treasurer acts as its general agent in endorsing, from time to time, large quantities of its commercial paper, it will be bound thereby, if the directors ought to have known he was so doing.

8. A manufacturing corporation has no authority to give accommodation paper.

9. A manufacturing corporation is bound by an endorsement of paper given for accommodation only, when in the hands of a *bona fide* holder.

10. A trading corporation, owning most of the stock of a manufacturing corporation, was the agent for the sale of all the product manufactured, and received the entire proceeds of sales. It supplied the manufacturing corporation with running expenses, and to such end turned over commercial paper, which the manufacturing corporation endorsed and discounted at banks, using a large amount of the cash thus obtained in meeting pay-rolls, and some of it going to the credit of the trading company.—*Held*, that, in view of the relations of the corporations, the paper whose discount went to the credit of the trading company was not accommodation paper.

11. Even if a part of the paper was accommodation paper, the banks were *bona fide* holders.

12. A trading and a manufacturing corporation carried on the business of manufacturing and selling sewing machines as one entire business. The one owned most of the stock of the other, and paid an agreed dividend to the holders of the balance of said stock, and such was the only accounting had between them. The one delivered to the other large quantities of customers' and agents' notes, which were endorsed by the other and discounted at a bank, which placed the discount to the credit of the other, which used a part of the funds for its own benefit, and also signed checks on said bank named as payee, to be paid out of said discount, for money that was applied to taking up other notes of like character previously discounted in said bank by said trading corporation, without the endorsement of said manufacturing corporation.—*Held*, that none of the paper endorsed by the manufacturing corporation was accommodation paper.

13. The bank did not take such paper with knowledge of any infirmity in it, or with such suspicion, with regard to its validity, so as to make its conduct in taking it fraudulent.

31

Blake *v.* Domestic Manufacturing Co.

14. Where one corporation, by endorsing the paper of another, obtains a bank discount, which is used in paying obligations due from it, but which is charged against said other corporation primarily bound to pay said obligations, there can be no escape from liability to the bank on said endorsement on the ground that it was made for accommodation only.

15. A corporation is liable on an unauthorized endorsement of notes made by its assistant treasurer, where, after such endorsement, the notes were discounted, and it received the discount, which was used in paying its employes.

16. In 1881 a sewing machine company, to secure bonds due from it, transferred to a trustee, by a deed of trust, certain shares of stock in a manufacturing company. Subsequently the trustee agreed that, upon the execution of certain mortgages, he would transfer to the sewing machine company said stock. The mortgages were executed, but he did not surrender the stock, and three years thereafter the sewing machine company became insolvent before paying said bonds, and a receiver was appointed.— *Held,* that said security given in 1881 was unimpaired.

17. Said receiver could not compel said trustee to convey said stock to him.

18. A transfer by an insolvent Ohio corporation of all its assets to a New Jersey corporation, assuming all indebtedness, is not void, under the laws of Ohio, as against bondholders of the Ohio corporation, who have no lien upon the property transferred.

19. Where one corporation transfers all its assets to another, assuming all indebtedness, the bondholders of the former are creditors of the latter. Such bondholders, however, have no equitable lien on its assets, in preference to other creditors of the latter, whose claims arose subsequent to such transfer.

On bill, cross-bill, answers and replications, and on appeals from determination of receiver allowing claims. Heard together on pleadings and proofs taken orally.

*Mr. Charles L. Corbin,* and *Mr. S. B. Brownell* and *Mr. Rush Taggert* (of the New York bar), for the complainants.

*Mr. Thomas N. McCarter,* and *Mr. Doyle* and *Mr. Reeve* (of the New York bar), for the National Park Bank et al.

*Mr. Richard V. Lindabury,* and *Mr. J. C. O'Conor* (of the New York bar), for the Garfield Bank et al.

*Mr. James E. Howell,* for Andrew Kirkpatrick, receiver.

EMERY, V. C.

The litigation in these cases arises out of the failure of two corporations of this state, the Domestic Sewing Machine Company and the Domestic Manufacturing Company, which were declared insolvent on June 2d, 1893, on separate bills, the defendant Andrew Kirkpatrick being appointed the receiver of each corporation. These two companies had been connected in the manufacture and sale of sewing machines on a large scale since the organization of the sewing machine company, in April, 1891. Previous to this date, and since the organization of the manufacturing company, in 1881, a similar business connection existed between the manufacturing company and the Domestic Sewing Machine Company, a corporation organized in 1870 under the laws of the State of Ohio. The sewing machine company of New Jersey was organized to take over the assets and continue the business of the Ohio company, and by deed dated April 22d, 1891, the New Jersey company purchased the assets of the Ohio company and assumed its indebtedness, and also that of the Domestic Manufacturing Company, and to carry out and fulfill all existing obligations and contracts. The deed further declared that the New Jersey company "hereby pledges all the property and assets above conveyed and transferred to it for the payment of the obligations so assumed." At the time of this transfer of its assets from the Ohio company to the New Jersey company the Ohio company had an outstanding bonded indebtedness of about $300,000, which remained unpaid at the failure of the company. This same bonded indebtedness also existed on the part of the Ohio company in 1881, at the time of the organization of the manufacturing company, having been created as early as 1875. The Ohio company owned one thousand nine hundred and eighty shares of the entire two thousand shares of the capital stock of the manufacturing company, and upon the organization of the latter company, in 1881, and by deed of trust, dated April 21st, 1881, the Ohio company conveyed to Eli J. Blake and John Dane, Jr., as trustees, this one thousand nine hundred and eighty shares of stock to secure these bonds and other obligations specified. The disputes now to be settled arise out of a twofold claim made by the complainants, who are the holders of $291,000 of these

bonds. Their first claim is based upon the pledge of the manufacturing stock to secure their bonds, and also upon their rights as creditors of the sewing machine company, which is the owner of the stock, subject to the pledge for their benefit. The receiver has allowed or approved claims to the extent of about $300,000, which have been proved against the Domestic Manufacturing Company by six banks holding notes endorsed, or purporting to be endorsed, by the manufacturing company. The complainants, as such creditors of the sewing machine company, appeal to this court, under the statute (section 78 of the Corporation act), from the determination of the receiver allowing these claims. The ground of appeal is that the endorsement of the manufacturing company made on these notes was an endorsement by David Blake, the treasurer of the company, without authority, and that the endorsements are not binding upon the company. So far as relates to this dispute, the formal proceeding is that of separate appeals by the complainants from the allowance of the claim of each bank.

A preliminary motion to dismiss the appeals was made upon the ground that the complainants had no interest in the allowance of the claims. This was overruled, on the ground that, as the complainants were certainly creditors of the sewing machine company, even if their claim to a lien was invalid, and the sewing machine company, as part of its assets, owned the manufacturing company stock, the complainants were directly interested in protecting this latter company against unfounded claims, and inasmuch as the same receiver represented both companies and had allowed the claims, the equitable situation was one where the greatest possible latitude should be given to the other creditors of either company in contesting claims against the manufacturing company supposed to be invalid.

The other claim of the complainants is the one upon which their bill in equity is based, and, briefly stated, the nature of this claim is that, at the time of the transfer by the Ohio company of its assets to the New Jersey company, the Ohio company was insolvent; that the transfer to the New Jersey company was void, under the laws of Ohio, and that it was in fraud of the complainants as creditors of the Ohio company, and that complainants

have a lien upon all the real and personal assets of the Ohio company existing at the time of the transfer prior to the claim of the creditors of either of the New Jersey companies. If, however, the transfer of its assets by the Ohio company to the New Jersey company should be held valid, then complainants claim that, by virtue of the pledge of the existing assets made by the New Jersey company upon the transfer to pay the debts of the Ohio company, the complainants, as creditors of the Ohio company, have a lien on this property in the receiver's hands superior to any claim of any creditor of the New Jersey Sewing Machine Company. The complainants also claim that the patents and trade-marks originally belonging to the Ohio company and assigned to the New Jersey company were specially pledged to secure their bonds, and are so applicable in the receiver's hands to their claims. The bill further specially attacks the validity of the endorsement of the manufacturing company's notes by David Blake, and the allowance of the receiver of the claims of the banks founded thereon, and states that appeals are pending from these determinations, and the receiver and the banks were made defendants to the bill. The claims presented and allowed against the sewing machine company amount to about $1,500,000, while the claims allowed against the manufacturing company are mainly the claims on the notes held by the banks. The principal asset of the sewing machine company in the hands of the receiver is the stock of the manufacturing company, and the main dispute between the bondholders, the receiver and the banks, both in the equity case and on the appeals, is as to the liability of the manufacturing company on the notes endorsed by David Blake as its treasurer. The equity cases and the appeals were therefore heard together, and in the disposition of the cases I will first take up the question of the validity of notes proved against the manufacturing company, leaving certain features of the equity case, not directly connected with this main question (including the matters set up in the answer and cross-bill of the receiver), for a further separate statement and conclusion after disposing of the question which is the substantial one in both proceedings.

All the notes in question purporting to bear the endorsements of the manufacturing company are similar in character, and are

notes made by persons who were selling agents of the Domestic Sewing Machine Company (of New Jersey), and are made payable to the order of the sewing machine company at its place of business in New York City. They are all endorsed in the first place by the Domestic Sewing Machine Company by David Blake, vice president, his authority to endorse for this company not being called in question. They are then (with three exceptions, which will be specially noted hereafter) endorsed in the following form: "Domestic Mfg. Co., David Blake, Treas."

Thus endorsed the notes were received by five of the banks—the Phœnix National, the Garfield National, the National Broadway, the National Park and the Chemical National—for discount to the credit of the manufacturing company, in its account with these banks, respectively, and the proceeds of the discounts were, by these banks, respectively, passed to the credit of the manufacturing company. The Second National Bank of Cooperstown purchased in the open market two of the notes, similarly made and endorsed, for full value, before maturity. The First National Bank holds five of the notes (similar in form), amounting to $29,714, as collateral to demand notes of the sewing machine company, and these notes held by the First National Bank appear to have been so received as collateral, in substitution for other notes, to which the manufacturing company were not parties, and which were held as collateral to this loan made by the First National Bank to the sewing machine company. The original loan by the First National Bank to the sewing machine company of Ohio was made in 1890, and the notes endorsed by the manufacturing company were received by it, in substitution for the other collateral, in April, 1893. All of the notes held by each bank were duly protested for non-payment. The purchase of the notes by the Cooperstown bank in open market, and the receipt of them by the First National as collateral for the sewing machine company's debt, involve questions not raised in reference to the notes received by the banks discounting for the credit and account of the manufacturing company; but the preliminary question in all of the cases is as to the authority of David Blake to impose the liability of endorser upon the manufacturing company, and this question will therefore be first considered.

The complainants, in their bill and by their petitions of appeal, charge that these endorsements were made without authority from the manufacturing company, and without the knowledge or consent of its board of directors, and were made for the purpose of using the credit of the manufacturing company to borrow large sums of money, in order to enable the sewing machine company to carry on its business. The banks, in their several answers to the bill and petitions of appeal upon this question of authority, allege that the endorsements were made with the knowledge and consent of the board of directors of the manufacturing company, and in the regular course of the business of the company, with which the directors were familiar; that David Blake, the treasurer of the manufacturing company, was also its general agent and manager, and invested by its directors with the entire management and care of the business, and with the possession and collection of its assets and the application of their proceeds to its business; and that David Blake, as treasurer, was held out to the world, and to the creditors of the manufacturing company, as authorized to endorse these notes for discount or sale. The five banks discounting the paper further insist that the proceeds of the discounted notes actually came to the use of the manufacturing company and were received for its benefit, and it cannot therefore escape liability for the repayment of the money, even if the endorsement was unauthorized. The Cooperstown bank, in its answers, also alleges that the notes held by it were commercial paper of the manufacturing company, made in the regular course of business, and that this money raised therefrom was used by David Blake, as treasurer, in the business of the company. In answer to the claim of the banks that the money procured by the discount or sale of the notes in question was, in fact, received by the manufacturing company and applied to its use, and that the company is therefore liable, even if the endorsement of the treasurer was originally unauthorized, the complainants claim that, with the exception of the sum of $10,023.35, of the claim of the National Broadway Bank (to which extent liability is admitted), the entire amount raised by the discount and sale of the notes was used in the payments of debts and obligations of the sewing machine company, and did not, in fact, come to the use of the

manufacturing company; this application, as well as the discounts, being made without the knowledge or consent of the directors of the manufacturing company and without their ratification. The issues raised, therefore, in reference to the notes are as follows:

*First.* Was David Blake, the treasurer, authorized to endorse the notes to the banks?

*Second.* Were the notes accommodation paper of the manufacturing company, and to be so treated as invalid on that account in the hands of the banks?

*Third.* Did the proceeds of the notes, or of any of them, come to the use of the manufacturing company in such manner as to charge it with liability, either for the notes or the money received thereon?

As to the authority of David Blake, as treasurer, to endorse the commercial paper of the company, it is not disputed that such authority was not directly conferred upon the treasurer, either by the by-laws of the company or by any formal resolution of the board of directors. The only provision of the by-laws relating directly to the treasurer is a section providing for his giving bond for the faithful discharge of his duties. These duties were not specified, nor was there, either from the by-laws or from any resolution of the board of directors, any direct authority to any officer of the company either to make or to endorse its commercial paper in the course of business. Counsel for the banks claim that the treasurer of a manufacturing and trading corporation of this character has the right, by virtue of his office, to endorse the business paper of the corporation and to bind the corporation thereby, and the decisions in some states relating to the implied powers of cashiers and treasurers are cited as supporting this contention. But, in my judgment, they do not reach to the extent claimed, and, in view of the general provisions of our statute laws, that the business of the corporation is to be managed by the directors, and the numerous decisions of our courts that the powers of the officers of a corporation are simply the powers of agents delegated to them by the board of directors, I am of opinion that the treasurer of a manufacturing corporation is not, merely by virtue of his office, and in the absence of any

authority delegated to him by the directors, authorized to endorse the company's note for discount or sale. Such delegation of authority, however, may be made by the directors in other methods than by express resolution; and the claim made here by the banks is that, by the entire method and course of business of the company, adopted by its directors, or under their authority or permission, the treasurer was held out to the public and to the defendants as its general agent for the purpose of endorsing paper of this character, and the company are therefore bound by his endorsements. Such holding out, either to the public or to any of the banks whose claims have been allowed, is denied by the complainants, and is the main question of fact involved in this branch of the case. The evidence relating to this point involves directly the connection and course of business of both companies from the time of their organization, and the principal facts which I find to be established by the evidence are as follows:

[After examination of facts in case, reported in full in *38 Atl. Rep. 245, 255,* the opinion proceeds.].

I find, therefore, as facts in the case, that from July, 1890, to the failure of the manufacturing company, David Blake, as its treasurer, in fact acted as the agent of the company in the endorsement and discount for its own credit of notes received by it from the sewing machine company to the credit of its current accounts with that company, and that these endorsements and discounts by David Blake were made in such a multitude of instances and to such an extent as to be sufficient to make him the agent of the company for the purpose of endorsing and discounting paper of this character, if an agency for such purpose could be constituted by the directors negligently permitting the agent to hold himself out to the world or public.

I also find, for the reasons above given, that the directors of the company did not, in fact, know of these endorsements in the Newark banks or the New York banks, which are relied on as establishing this agency to endorse, but that they might have known them, and by the exercise of a slight degree of diligence. The further relevant fact to be noted is that it does not appear that the New York banks, or any of them, knew, at the time of making their discounts or purchasing the notes, that David Blake

had been previously making the endorsements in the Newark banks, nor does it appear that those of the New York banks who made discounts or purchases subsequent to the others knew of the previous endorsements or discounts to the other New York banks. Upon these facts the question of law arises whether the agency of David Blake to endorse is sufficiently proved by its exercise in the multitude of instances before the endorsements in question, which should have been known to the directors, and the company is therefore liable; or whether actual knowledge by the directors of the previous endorsements is necessary in order that the company may be bound by their holding out the agent to the public, and whether it must also appear that the banks receiving the notes in question took them on the faith of such previous endorsements and relying on them. Counsel for the banks, on this branch of the case, contend that the agency to endorse was itself here created by the continued exercise of the authority to endorse, which should have been known to the directors; that, as to the public or those dealing with the company in similar transactions, the proof that the agent has, in a multitude of instances, exercised the power, creates a general agency for that purpose as against the principal, where the principal either knows or ought to have known that the power was being exercised.

It is contended, on the other hand, by the complainants that where, as here, no actual authority to endorse for the company was given, and the liability of the company is based upon the apparent or implied authority which arises from a holding out of the agent to the public, then the liability does not arise unless, in the first place, the directors had actual knowledge that the agent was so holding himself out, and unless, secondly, the endorsements and discounts in question were made by the banks in reliance upon such holding out or previous endorsements.

These contentions are based upon the view that the liability in such cases of ostensible authority rests upon the theory of ratification, which admittedly presupposes and requires previous knowledge on the part of the directors; and also, in addition, upon that of estoppel, which also requires knowledge of the course of dealing upon the part of the creditors and reliance upon the course of dealing.

Very elaborate and able arguments have been submitted to sustain these views, with a citation and discussion of many cases involving the question of agency, in some of which questions of ratification and estoppel were also involved. I shall not review or recite these cases or those cited by counsel for the banks in detail, but state the conclusions I reach after an examination of these and other authorities. The precise question now involved, as I understand the case, relates to the effect against the company of an agent's holding himself out to the public as authorized to endorse for discount and for the company's credit the business paper of the company, without the directors' actual knowledge, but when they ought to have known of the agent's discounting for their credit; and the point to be resolved is whether the exercise of the authority, under such circumstances, creates the power as to the public, or whether the power is only created as against the company, by reason, also, of the actual knowledge of the directors and of the actual reliance upon the previous holding out to the public by the person dealing with the agent. The solution of the question depends, in my judgment, upon the application of principles relating to the law of agency, which are now too firmly settled to be called in question. In the first place, a distinction between special and general agents is firmly settled in the law, which has also recognized general agencies, either to transact a business or to perform a particular act or class of acts for the principal.

And in reference to the creation of these general agencies, either for a particular class of acts or the transaction of a business, the principle established is that such general agencies are, in fact, created against the principal by reason of his conduct in permitting the agent to hold himself out to the public as having the authority. In *Whitehead* v. *Tuckett, 15 East 400 (1812)*, Lord Ellenborough, in reference to the distinction between a particular and a general authority (for a particular class of acts, as to sell sugar), says (at *p. 408*) "that a general authority does not import an unqualified authority, but that which is derived from a multitude of instances."

This distinction between a general and special agency or authority as thus stated by Lord Ellenborough has been adopted

by other cases and authorities, and is the distinction which Mr. Justice Story (*Story Ag.* § *19*) gives as the distinction generally recognized.

In *Smith* v. *McGuire, 3 Hurlst. & N. 554* (*1858*), the question of the effect toward the public of permitting another to act as a general agent was directly involved, and the particular question involved was whether the agent, who, in the transaction of the business of the principal, had constantly chartered vessels, but always or usually under special instructions, had a right to charter a vessel without such instructions, so as to impose a liability upon the principal for not taking a cargo. Chief-Baron Pollock says (at *p. 560*) : "I think that questions of this kind, whether arising on a charter party, a bill of exchange or any other commercial instrument, or on a verbal contract, should be decided on this principle. Has the party who is charged with liability under the instrument or contract authorized and permitted the person who has professed to act as his agent to act in such a manner and to such an extent that, from what has occurred publicly, the public in general would have a right to reasonably conclude, and persons dealing with him would naturally draw the inference, that he was a general agent? If so, in my judgment, the principal is bound, although, as between him and the agent, he takes care on every occasion to give special instruction." In this case the holding out to the public, by permitting the continued and general acts, itself, as to the public, created the general agency to bind the principal by the act in question, although the actual authority as created between the principal and agent would not have permitted the act. The same principle, that a general agency to do a particular act (*e. g.,* to endorse paper and make loans) may be created by a holding out to the world, is also recognized in our own decisions. In *Fifth Ward Savings Bank* v. *First National Bank, 18 Vr. 357* (*New Jersey Supreme Court, 1885*), the treasurer of the plaintiff, a savings bank, obtained a loan of the defendants in the name of the plaintiff and ostensibly for its use, pledging securities of the savings bank for its repayment. The treasurer fraudulently misappropriated the funds to his own use, and the savings bank brought an action of trover for the value of the securities. On

verdict for the plaintiff and application for a new trial, Chief-Justice Beasley said (at *p. 358*) : The treasurer not having express power to make the loans or pledge the bonds, "the only open point of inquiry on this question was whether or not the plaintiff had put its treasurer in such an attitude *before the public or before the defendant* as to have warranted a reasonable inference that he was its general agent, and had the right to execute the transaction in question." In this same case on error (*Fifth Ward Savings Bank* v. *First National Bank, 19 Vr. 513 (Errors and Appeals, 1886)*), Mr. Justice Depue, delivering the opinion of the court, said (at *p. 527*) that "when, in the usual course of a business of a corporation, an officer has been permitted to manage its affairs, his authority to represent the corporation may be implied from the manner in which he has been permitted by the directors to transact its business, and that, in such cases, the authority of the officer does not depend so much upon his title, or on the theoretical nature of his office, as on the duties he is in the habit of performing."

The careful and precise statement in the above case by the learned chief-justice of the question to be left to the jury in such cases distinguishes, it will be noticed, between the holding out to the world and the holding out to the defendant, and this distinction, as it seems to me, touches directly one of the questions now involved, viz., whether the general agency in such cases arises from estoppel. If there was a holding out to the defendant, but not a holding out to others or to the public as well, then the agency in such case might well be said to depend upon the estoppel of the principal to deny the agency which he had held out to the creditor and which the creditor had relied on. But it is clear, I think, that in commercial transactions, which must be carried on largely by means of general agencies to do particular acts, there is an agency which is created by the general and public exercise of an authority with the permission of the principal, and where this general agency, in fact, exists as arising from this source, it is not necessary for the creditor to show further that it was previously known to him and that he acted in reliance on it. Where the agency is a general agency provided by the continued exercise of the authority toward the public by

the permission of the principal, and there is an estoppel to the public, the law presumes that the public knew of the holding out by the principal and acted on it.

The principle of technical estoppel as between parties is not at all involved in such cases, and, as it seems to me, could not be, for the reason that an estoppel of the principal toward the third person dealing with the agent must depend upon the representation by the principal made to the creditor. A representation to others could not, generally speaking, give rise to a technical estoppel at all, and the holding out to others or to the public, if it is to have any legal basis at all, must be by creating of itself and wherever it is proved to exist a general authority as to the public for the particular act. For this reason, as it seems to me, the distinction as stated by the chief-justice must be taken as the true one, viz., whether the holding out as general agent is to the public or to the particular dealer only. If the latter only, estoppel is the basis, but not in the former cases. The distinction is expressly made in a late case. *Fifth National Bank* v. *Navassa Phosphate Co., 119 N. Y. 256 (1890)*. Here a company's note was endorsed by its president. There was no proof of direct authority, and the only evidence from which authority could be inferred were numerous former endorsements and that the company's apparent obligations were satisfied. The plaintiff knew nothing of these former endorsements in discounting the note. Some of the former notes were endorsed to plaintiff, but in so few instances that no estoppel between the parties was created. In the court below the complaint was dismissed upon the ground that the endorsement in question was not made in reliance on the former endorsements.

On appeal the point was distinctly raised that knowledge of the previous endorsements to others was not necessary to be proved, and the court of appeals, reversing the judgment below, held (Finch, J., at *p. 260*) that the question whether the directors knew that the president was creating obligations against the company, and gave him authority by acquiescing in its exercise, should have been submitted to a jury, and that it was not necessary in such cases for the plaintiff to show, in addition, that its officers knew in advance of this exercise and ratification (by

acquiescence). "As to the plaintiff," says Finch, J. (at *p. 262*), "it becomes an actual authority." In a late decision of the court of errors and appeals (*Camden Fire Insurance Co. v. Jones, 24 Vr. 189 (Errors and Appeals, 1890*) a certificate of stock was signed in the principal's name, and was accepted by the assignee, supposing that the signature was, in fact, the principal's signature. The trial judge overruled evidence of numerous acts by the agent for the principal with other persons, offered by the assignee for the purpose of showing that the agent was, in fact, authorized, as the general agent of the principal, to make this assignment of stock. The reason for overruling the evidence was that the assignee had not relied on the agency. All of the judges agreed that the refusal to admit the evidence was error, if the evidence was sufficient to show the agency, in fact, to make the transfer, and they differed only as to the effect to be given to this evidence. The decision seems to be a direct and controlling authority to the point, that the powers of an agent may be proved by the exercise of previous acts with other persons, with the permission of the principal, and that, if these previous acts establish, or tend to establish, the agency, not only is not actual reliance on them in the transaction in question not required to be proved, but this agency arising from this source may be established and relied on at the trial, even if the contract in question was not supposed to be a contract of the principal by an agent, but a direct contract of the principal himself. A similar conclusion as to the effect of proof of general agency was reached in the early case of *Williams v. Mitchell, 17 Mass. 98,* where a sale was made upon the faith of an express written authority to buy, apparently executed by the principal, but which was forged by the supposed agent. It was held that, notwithstanding the express reliance of the vendor on this forged authority alone, he could show the agent was, in fact, a general agent to purchase goods for the principal, and recover on the proof of such authority, although this fact of general agency has not been relied on or even known. The doctrine is established beyond question that where any particular officer of a corporation, with the knowledge and assent of the directors, is held out to the public as having authority to endorse its regular business

paper, such holding out to the public creates the authority for
the purpose, and in the great mass of cases enforcing this rule
the application of the rule is not limited to cases where it can be
shown that the paper was received with actual knowledge of the
previous holding out and in reliance on it.

I refer to a few of the leading authorities on this point, stating
the rule without any such limitation. *17 Am. & Eng. Encycl. L.
139; Abb. Tr. Brief (on Facts) §§ 107, 108,* citing cases.

In *Olcott* v. *Tioga Railroad Co., 27 N. Y. 546 (1863)*, Seldon,
J., said (at *p. 558*) : "The powers of the agent of a corporation
are such as he is allowed, by the directors or managers of the
corporation, to exercise within the limits of the charter, and
the silent acquiescence of the directors or managers may be as
effectual *to clothe the agent with power* as an express letter of
attorney," citing numerous cases. *Lester* v. *Webb, 1 Allen 34
(at p. 36, Chief-Justice Bigelow, 1861).; Prescott* v. *Flinn, 9
Bing. 19,* where general authority of clerk to endorse was in-
ferred from previous endorsements, and no limitation was made
that plaintiff should have knowledge.

In the New Jersey cases, above referred to, no such limitation
was attached to the statement of the rule, and the cases relied
on by complainant are mainly cases where the liability depended
upon an estoppel by holding out to the party, rather than on a
general agency arising from a holding out to the public.

Upon these considerations I reach the conclusion that the pre-
vious endorsements of David Blake of the business paper of the
company for discount to its credit, if made with the permission
or consent of the directors, were of such a character as to entitle
the banks discounting the paper in question to hold the corpora-
tion liable on the endorsements, as made by the general agent
for that purpose, although the paper was not received or dis-
counted by them on the faith of such previous endorsements, but
simply on the belief that he was the agent of the company for
the purpose of endorsement and discount; and the next question
of law to be decided is whether the permission and acquiescence
of the directors in relation to these endorsements of David Blake
in the Newark and New York banks is sufficiently established by
showing that, although the directors may not, in fact, have known

of the endorsements, they ought to have known them, and, by the exercise of a moderate degree of diligence, might have known them. So far as relates to questions involving general agencies established by evidence of this character, and arising between the principal and third persons, who have dealt with the agent in good faith as being the agent, the authorities seem to establish that, so far as such third persons are concerned, the principal is bound by the acts of the person acting as his general agent, if he *ought to have known* that the agent was so acting, as well as in cases where he had actual knowledge. Thus, in *Davidson* v. *Stanley, 2 Man. & G. 721 (1841)*, the action was upon bills of exchange drawn and endorsed by a farm bailiff, who was agent for the defendant, and without express authority for that purpose, and the question submitted to the jury was whether the circumstances of the case (proof of previous endorsements by the bailiff and other facts) were sufficient to establish a general authority. The jury found for the defendant, and an application for a new trial was denied, Chief-Justice Tindall saying (at *p. 828*) that it was not shown that the defendant knew, *or had the means of knowing,* that his name had been previously used by the agent. In *Martin* v. *Webb, 110 U. S. 7 (1883)*, the authority of a cashier to cancel certain notes secured by trust deeds was involved, and there being no express authority, his previous cancellation of many previous notes was one of the circumstances relied on as establishing a general authority for this purpose. Actual knowledge by the directors of these transactions was not proved, but on this point of the duty of the directors to know of the course of business, and the effect of their negligence as charging the company with knowledge, it was said that that which directors ought, by proper diligence, to have known as to the general course of business, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with it upon the basis of that course of business.

In *Conover* v. *National Mutual Insurance Co., 1 N. Y. 290 (1848)*, the policy issued by the company prohibited an assignment "unless by the consent of the company manifested in writing." A consent was signed by the secretary. No express

authority was proved, and the course of business was relied on as showing that the secretary was the officer who uniformly gave the consent, and that he made regular entries of the assignments on the books of the company. For the defence it was insisted that these acts of the secretary were never brought to the knowledge of the directors or received their formal ratification, but it was held on this point by Johnson, J. (at p. 292), "that the directors were bound to know the uniform course of business pursued by their sole agent for the transaction of their business at their office, especially where regular entries of his acts were made in their books, and they must be held responsible on the ground of a tacit assent and approval, unless they can show that, by a strict vigilance and scrutiny into his acts, they were unable to ascertain the course he was pursuing, and could not therefore arrest it or put the public upon their guard." And with reference to the special obligation resting upon directors of incorporated companies, with reference to general authority exercised by their agents toward the public, it was said (at p. 292): "Incorporated companies, whose business is necessarily conducted altogether by agents, should be required, at their peril, to see to it that the officers and agents whom they employ not only know what their powers and duties are, but that they do not habitually, and as part of their system of business, transcend those powers. How else are third persons to deal with any degree of safety? They can have no access to the by-laws and resolutions by the board, and no means of judging in the particular instance whether the officer is or is not within the prescribed limits."

The same doctrine of imputing to a company knowledge of, and acquiescence in, acts of an officer acting as a general agent was applied in the late case of *Hanover Bank* v. *American Dock and Trust Co., 148 N. Y. 612 (1896)*. In this case negotiable merchandise certificates were issued by an officer to himself without express authority. The fact that he had several times issued these to himself was, with other facts, relied on as establishing a general authority to issue to himself. The directors did not actually know of these issues. Vann, J., says (at p. 623): "While it does not appear that the directors actually knew of these transactions, it was a question of fact for the jury to say

whether they ought not to have known, under all the circumstances, as their ignorance was no excuse, unless they were reasonably diligent in supervising the method and details of the business under their control." And as to the special effect of knowledge that could have been derived from an examination of the books, the court further says (at p. 623) : "Whatever the entries in the books of the defendant, made in the ordinary conduct of its business, would have disclosed, the jury would have been warranted in finding had come to the knowledge of the directors, who were charged with the duty of reasonable inspection of the books and reasonable supervision of the conduct of the officers."

The doctrine of these cases imputing to the directors actual knowledge of a fact which, in the reasonable performance of their duty, they ought to have known, and establishing the rights of third persons against the company, the principal, upon the same basis as if actually known and assented to, is in harmony with the rules applied in other cases, both at law and in equity, as to the means of knowledge being equivalent to actual knowledge. The general rule as to charging notice or knowledge of a fact is "that whatever puts a party upon inquiry amounts, in judgment of law, to notice, provided it becomes a duty, as in the case of purchasers and creditors, and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding." 4 Kent Com. § 179; Hoy v. Bramhall, 4 C. E. Gr. 563, 572 (Errors and Appeals, 1868). The decisions cited above seem to be an application of this general principle, and in cases like the present the rule should be applied strictly, rather than relaxed; and, in my judgment, the directors of the manufacturing company must, on the facts of this case, be charged with knowledge that David Blake, as their treasurer, was endorsing the paper received by the company from the sewing machine company for credit to its current account, and with the tacit or implied consent to these endorsements. With these views as to the legal rules applicable to the case, I hold, therefore, as the result of the evidence, that the banks have established, by sufficient proof, a general authority in David Blake, as treasurer of the manufacturing company, to endorse and discount the

business paper of the company received from the sewing machine company for credit on its account, and that reliance by them on this general authority previously exercised need not be shown or proved in order to recover.

I have, in my above conclusions, limited the finding of authority to endorse to the business paper of the manufacturing company received from the sewing machine company in the regular course of business; for if the paper was accommodation paper, and so known to be by the banks receiving it, then the authority to bind the corporation does not exist, for, as is well settled, the corporation has no authority to give accommodation paper. *National Bank of the Republic* v. *Young, Receiver, 14 Stew Eq. 531, 538 (Errors and Appeals, 1896).*

But in reference to the liability of a trading or business corporation, such as the manufacturing company, on accommodation paper, the rule, as settled by this case (at *p. 538*), is that the title of the holder for value before maturity can only be defeated by proof of such circumstances as show that he took the paper with knowledge of some infirmity on it, or with such suspicion with regard to its validity as that his conduct in taking it was fraudulent. It was not claimed by the complainants at the hearing that such proof had been made in this case as to any of the banks, and the whole defence against the notes was put upon the ground of want of authority to endorse. But, in order to rely on or rebut a claim of liability imposed by reason of the actual receipt by the manufacturing company of the benefit of the proceeds of discount by the manufacturing company, a large amount of testimony has been taken for the purpose of showing whether the proceeds of discount went ultimately to the benefit of the sewing machine company and not of the manufacturing company. There is no dispute that the proceeds of discount of the notes in suit were, in the first instance, deposited in the respective banks to the credit of the manufacturing company, and that all of the payments out were made by the banks on the checks of the manufacturing company, but the complainants claim that, with the exception of about $10,000, which went directly to the manufacturing company, the entire balance of the proceeds of discount was for the benefit of the sewing machine company. Complain-

ants did not, however, either at the trial or on the hearing, claim that the banks were chargeable with fraudulent conduct in taking the paper or that this was established by the evidence. My conclusions on the whole evidence relating to this point of the receipt of the proceeds are—*first,* that the manufacturing company actually received the proceeds of the discounts to a large extent, and that, as to the balance of the proceeds of discount, which seems to have gone ultimately to the credit of the sewing machine company, the paper was not, in view of the relation between the companies and on the whole circumstances of the case, accommodation paper; and *secondly,* that even if it was, in fact, accommodation paper, there is not evidence to warrant the inference that the banks took the paper fraudulently. On examining the evidence and statements of the accountants upon this subject it appears, however, that there are certain features relating to the application of the proceeds of discount by the banks, respectively, to which attention should be given. And as they were not specially referred to by counsel on either side, it seems to me necessary to state here somewhat in detail the facts which appear in relation to the application of the proceeds of the notes now claimed by each of the banks, as bearing upon this question whether, if the paper was, in fact, accommodation paper, some of the notes were taken under circumstances that charged the banks with fraudulent conduct in taking the paper.

[Examining in detail the facts proved in relation to the notes held by each of the six banks, whose claims are excepted to by the complainants, the conclusion is reached, as to the notes held by five of the banks, viz., the Broadway Bank (except as to three notes hereafter mentioned), the National Park Bank, the Garfield National Bank, the Phœnix Bank and the Cooperstown Bank—(1) that the notes discounted by them were not accommodation paper, and (2) that the notes were not taken under such circumstances as to show either knowledge of infirmity in the paper or fraudulent conduct, within the rule laid down in *National Bank of the Republic* v. *Young, supra.* The opinion in full on these points is printed in *38 Atl. Rep. 260, 262.*]

But these conclusions do not cover the case of the First National Bank. The notes, amounting to $29,714, held by this bank, as

appears from the proofs in the case on this point, which are
somewhat meagre, were received by the First National Bank as
collateral and in substitution for other notes, to which the manu-
facturing company were not parties, and which were held as col-
lateral to a loan made by the First National Bank to the sewing
machine company and still outstanding. The loan was made to
the Ohio company in 1890, and inasmuch as, by the agreement
of transfer made by the Ohio company in April, 1891, the New
Jersey company assumed all the obligations of the Ohio sewing
machine company, as well as of the manufacturing company, the
note was purely the New Jersey sewing machine company's debt.
The note or endorsement of the manufacturing company as col-
lateral to this debt would, therefore, on the face of the trans-
action, seem to be purely accommodation on its part, and the
First National Bank not a *bona fide* holder of the accommoda-
tion paper for value before maturity. If this is the correct *status*
of their claim on these notes, then it would seem to be question-
able whether their claim is valid, but inasmuch as the point was
not raised at the hearing, I will hear further argument on this
point, if counsel desire.

Nor do the above conclusions apply to three notes included in
the claim of the National Broadway Bank, and which were en-
dorsed, not by David Blake, as treasurer, but by George A. Blake,
as assistant treasurer of the manufacturing company. These
notes were also notes of the agents of the sewing machine com-
pany, payable to the order of the sewing machine company, at
its New York office, and after the endorsements by the sewing
machine company were endorsed by George Blake, as assistant
treasurer of the manufacturing company, for discount to the
credit of that company in the National Broadway Bank. They
were of the following amounts and dates: April, 24th, 1893,
one for $2,786; one April 29th, 1893, for $3,886, and one May
1st, 1893, for $2,630. The total of the notes was $9,302, and
on May 9th, 1893, they were discounted together as a single
transaction, the proceeds of discount ($9,115.09) being placed
to the credit of the manufacturing company. The balance to
the credit of the manufacturing company before this discount
was $1,861.06, and on the day following (May 10th) the manu-

facturing company gave a check on this account for $9,383.37, which is charged to the pay-roll on their books, and not charged to the sewing machine company in the books of either company. The check was, in fact, drawn to the order of A. Fahs, cashier of the Union Square Bank, and deposited there to the credit of the sewing machine company, which, on the same day, gave to the manufacturing company checks on its accounts in two Newark banks for the same amount, and from these latter checks the pay-roll of the manufacturing company was paid. The latter company, therefore, has received the proceeds of these three notes so discounted, and must, for this reason, be held liable, even if the endorsements be unauthorized, and the liability of the company for these notes is put upon this ground alone.

The appeals from the allowance of the claim by the receiver are therefore dismissed, except the appeal from the claim of the First National Bank, which will be reserved for further argument, if counsel desire.

In the equity case I will, at the present time, state the conclusions reached, leaving a further statement and opinion to be filed hereafter, if desired.

*First*. The bonds held by complainants are still secured by the trust deed of April, 1881, conveying the one thousand nine hundred and eighty shares of the Domestic Manufacturing Company stock, and have not lost the security of this deed by reason of the agreements of July 7th, 1890, and July 9th, 1890, and the action of their trustees thereunder.

*Second*. The conveyance, by the Ohio company to the New Jersey company, in April, 1891, of the assets of the former company must be held valid as against the complainants and their trustee, George Chapin, under whom they claim.

*Third*. The complainants, as bondholders, are creditors of the New Jersey company, but they have no equitable lien which can now be enforced against the assets of the New Jersey company in preference to its other creditors, except as to the lien on the Domestic Manufacturing Company stock, under the trust deed of 1881.

*Fourth*. The bill of the receiver for specific performance of the agreement of July 9th, 1890, by conveyance of the stock to him, must be dismissed.