3. Measurements were made after the collapse of the building, showing that the east wall had moved several inches westward after the work on the superstructure was begun, and it is claimed it was error to show this. It is urged that there is no presumption that the wall was not disturbed by the collapse of the building. I think, however, the circumstances were such that it could be found that the location of the wall was not changed by the collapse of the building.

[4] 4. It is further urged on behalf of the defendant city that the trial court erred in instructing the jury that Wallace, as superintendent of construction, was the agent of the city. I deem it sufficient to say that I think the charge was correct. It is possible that he may not have been the agent of the city in all that he did in the way of planning and superintending the works, and to some extent he may have exercised independent judgment; but in some respects, at least, it would seem that he was the agent of the city. If counsel desired to limit the charge in any way, that should have been done by an appropriate request. Furthermore, I do not see how it could affect the result, because the jury found Wallace was not at fault.

There are other exceptions to the charge. They have all been considered, but I think they are not well taken. I think that no error was committed which would justify the granting of a new trial.

I therefore reach the conclusion that the judgment and order appealed from should be affirmed, with costs. All concur except FOOTE, J., who dissents, upon the ground, first, that the plaintiff's intestate was a bare licensee, for whose injury the defendant city would not be liable, because of a nuisance upon its private property; second, that the evidence does not support the theory on which alone the verdict rests, viz., that the collapse of the building was due to the defects in the foundation wall.

---

(81 Misc. Rep. 298.)

VENNER v. NEW YORK CENT. & H. R. R. CO. et al.

CONTINENTAL SECURITIES CO. et al. v. MICHIGAN CENT. R. CO. et al.

(Supreme Court, Special Term, Albany County. June, 1913.)

RAILROADS (§ 137*)—EQUIPMENT—AGREEMENT FOR PURCHASE—ISSUE OF CERTIFICATES—VALIDITY.

Certain railroad companies entered into an agreement to cause to be built and delivered to a trustee named certain equipment, and the railroads furnished 10 per cent. of the cost price, and the trustee, on receiving the equipment, was authorized to issue certificates to an amount equal to the remaining 90 per cent. of the cost, the proceeds of the sale of the certificates to be used to pay the balance of the cost price. The railroad companies each agreed to lease specified portions of the equipment so purchased, the rent for the same to be applied to paying the trustee for its charges and expenses and the dividends on the certificates, and to retire a portion of the certificates each year. The certificates were authorized by the Public Service Commission. *Held*, that the contract was not ultra vires or illegal.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 435; Dec. Dig. § 137.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

Actions by Clarence H. Venner against the New York Central & Hudson River Railroad Company and others, and by the Continental Securities Company and Clarence H. Venner against the Michigan Central Railroad Company and others. Complaint in each action dismissed.

J. Aspinwall Hodge, of New York City, for plaintiffs.

Stetson, Jennings & Russell, of New York City, for defendant Guaranty Trust Co.

Alex. S. Lyman, of New York City, Albert H. Harris, and Thomas Emery, of New York City, for all other defendants.

CHESTER, J. Two actions are presented, which may be considered together. One is brought by a minority stockholder of the New York Central & Hudson River Railroad Company, and the other is brought by minority stockholders of the Michigan Central Railroad Company. In both it is sought to set aside, as ultra vires and illegal, an agreement known as the "New York Central Lines Equipment Trust of 1913." The actions are brought against each of said railroad companies and four other railroad companies affiliated with them, the Guaranty Trust Company, named as trustee in such agreement, and certain individuals, as defendants.

The six railway companies which are defendants are each parties to such agreement, and they are commonly known and named therein as the "New York Central Lines." The agreement in question was made in pursuance of a desire therein expressed that additions to equipment should be provided to enable these lines to transport and care for the traffic which they handle as common carriers, and it was an expediency devised for the purpose of raising the necessary moneys to provide such equipment, which was to consist generally of locomotives, passenger and freight cars, and other structures.

The three individual defendants, who are also parties to the agreement, are described therein as the "vendors." They covenant to cause to be built and delivered to said trustee certain equipment to be specified by the officers of the railroad companies. The railroad companies furnish at the outset 10 per cent. of the cost price of such equipment. The trustee, upon receiving the equipment, is authorized to issue certificates, which are known as "New York Central Lines Equipment Trust Certificates of 1913," to an amount equal to the remaining 90 per cent. of the cost of the equipment. The proceeds of the sale of such certificates are used to pay the balance of the cost price thereof. The six railroad companies each in turn agree to lease from the trustee specified portions of the equipment so purchased and conveyed to it by the vendors. The rent received for the same is applied to paying the trustee for its charges and expenses, taxes, interest, or dividends upon the certificates at the rate of 4½ per cent. and also to retire one-fifteenth of the principal of the certificates each year. The rentals are paid into a common fund for the benefit of the holders of all outstanding certificates, so that at the end of 15 years it is the purpose that all shall be paid, at which time the title to the equipment passes to the respective railroad companies, in accordance with their

agreement as to the division thereof among themselves. The railroad companies make themselves jointly and severally liable to pay the rental secured by the leases, and there is a provision that, in case of the default of any of the railroad companies in the payment of its proportion of any installment of rent due under the lease, the other railroad companies, or such of them as may elect to do so, shall have the right to pay the rental in default and to take possession of the equipment allotted to the company that has failed to keep its obligation. The total amount of certificates authorized by the agreement is $24,000,000, of which $12,547,000 have already been issued, and the equipment represented thereby has been allotted among the several railroad companies. Of this amount, $4,996,050 have been allotted to the New York Central & Hudson River Railroad Company, and $1,099,434 to the Michigan Central Railroad Company, and the balance to the several other railroad companies in various proportions.

The complainants in each case seek for a cancellation of the trust agreement, and of the leases executed pursuant thereto, as well as of the trust certificates issued under the agreement. They also pray for an injunction against the issuing of any more certificates and the further carrying out of the agreement or leases thereunder, and this motion is for judgment upon the pleadings and upon the facts admitted upon the trial. The defendants insist that no cause of action is stated in the complaints, and that upon the pleadings and the admitted facts they are entitled to judgments of dismissal.

Certificates of a like character as those in question here, known as the "New York Central Lines Equipment Trust Certificates of 1907," for $30,000,000, have been held to be obligations of the railroad companies within the meaning of section 55 of the Public Service Commissions Law (Laws 1907, c. 429), which requires the authorization of the Public Service Commission to a railroad corporation before it may issue "bonds, notes or other evidences of indebtedness payable at periods of more than twelve months after the date thereof." People v. New York Central & H. R. R. R. Co., 138 App. Div. 601, 123 N. Y. Supp. 125, affirmed on opinion below 199 N. Y. 539, 92 N. E. 1096.

It was stated on the argument by counsel for both sides that like issues of certificates for 1910 for $30,000,000, and for 1912 for $15,-000.000, have been authorized and issued, making upwards of $87,-500,000 of these securities which have been taken by investors. Up to this time it is not apparent that any question has ever been raised as to the validity of any of these issues. The certificates in question here have been authorized by the Public Service Commission, Second District, of New York, as well as by the Public Service Commission of the state of Ohio and the Railroad Commission of the state of Michigan, and it is stated that no appeals to the courts have been taken to review the orders granting such authority.

The only stock which the plaintiff in the first entitled action holds is in the New York Central & Hudson River Railroad Company, and the only stock which the plaintiffs in the second action hold is in the Michigan Central Railroad Company. Of course, they have no stand-

ing to complain of any acts, as ultra vires or unlawful, of any of the other railway companies in which they are not stockholders. The actions are in equity. Over $12,500,000 of the certificates in question are in the hands of innocent purchasers for value, to say nothing of the large amount remaining unpaid of $75,000,000 of like certificates of prior issues in the hands of investors. None of these purchasers are parties to the actions, and manifestly no judgments can here be made which will in any way affect their rights.

The principal point urged against the validity of the certificates is that the equipment trust agreement is in effect a guaranty by each of the railway companies of the debts or obligations of the five other of such companies, and that such agreement is therefore beyond the corporate power of these companies to make. Many authorities are cited in support of this proposition, none of which, however, covers an agreement at all similar to the one in question here. Much reasoning could be given to distinguish these authorities from the case presented here, but from the view I take of the question this is unnecessary. It should be borne in mind that the corporate power sought to be exercised here was ostensibly, at least, for the purpose of promoting the general objects and interests of each of these railways, and the defendants insist that the acts of their respective boards of directors in sanctioning these agreements were well within their discretionary powers in promoting the general aims and objects of their respective companies.

The following allegations from the answers of the railroad companies, which are admitted to be true, have an important bearing upon the question:

"The railroads owned by the railroad companies which are defendants herein form part of what is generally known as the 'New York Central System.' Those railroads are operated as supplements to each other, and as continuous and connecting lines, forming through routes between many different places of importance. Freight cars owned by any one of said companies, or in its possession pursuant to allotment under section 'Third' of said 'New York Central Lines Equipment Trust of 1913' agreement, are not confined to use on the lines of that company, but go through to destination when the shipments which they contain are consigned to points on other roads in said system. Said railroad companies unite in furnishing and contributing freight cars (including those under the 'New York Central Lines Equipment Trust of 1913'), which to a large extent are used in common on their lines, and are generally and constantly interchanged between them. This common use of freight equipment in through business is necessary to the proper conduct of the transportation business of that section of the country through which said New York Central lines extend, and has grown up in response to the necessities thereof. There is a large volume of through business, both passenger and freight, passing over the lines owned by said companies from points on the lines of any one of them to points on the lines of any or either of the others of them, and it is of importance that said companies should provide for such common use a sufficient amount of equipment to properly care for the same. All of said trust equipment, including passenger cars, freight cars, and locomotives, assigned for service on the different lines, is largely used in the movement of this through business."

This paragraph from the answer in each case clearly shows the needs and the uses for the equipment. The agreement to provide for it is made by solvent corporations, and only in the event of one of them

becoming insolvent would there be any pretense that there was any liability falling upon the others under what is alleged to be the guaranty of the debts of the others. But this agreement cannot fairly be regarded as a guaranty by one corporation of the debts of another corporation. It is rather an agreement that, in case one of the railway companies makes default in its obligation under the lease, any of the others could step in and take the equipment allotted to the defaulting company, by making good the rent in arrears. In other words, the company so stepping in purchases by this method additional equipment for its own use, and agrees to do so at the outset if such a contingency arises. This is a conditional purchase, rather than a guaranty of a debt.

It is urged, however, that in this way a company is likely to get much greater equipment than it needs for its corporate uses; but that is a contingency which is so unlikely to happen in this commercial age, when all railways are suffering from inadequate equipment, that it hardly needs to be considered, and especially not in a case where the additional equipment can find ready and profitable use, if not solely on the line of the company which purchased it, still upon the through lines of its associate companies.

No one questions the right of each of these railroad corporations, acting alone, to contract for all the equipment it fairly needs for its corporate purposes, upon such terms with respect to cost or credit as it can procure, and in such a case no question of ultra vires would be presented. Nor do I think there is anything unlawful in a joint agreement of several railway corporations, made for the purpose of carrying out the objects for which the respective corporations were created, and especially not when they are so closely related or affiliated as the one in question here. Olcott v. Tioga R. Co., 27 N. Y. 546, 84 Am. Dec. 298; 23 Cyc. 453.

Indeed, there would appear to be every advantage of price, quality, and rates of interest on moneys necessary to be borrowed when all act together, over what would obtain if each acted separately; and this view seemed to impress the Public Service Commission in this district, which gave its approval to these certificates on these as well as other grounds, as appears by the order it made. When the entire scheme outlined by the agreement is considered, I think it is well within the corporate powers of each company joining therein.

It is also urged that the agreement is illegal, because it is in perpetuation of an unlawful combination in restraint of trade; the theory being that some of these several lines practically parallel each other and should be competing lines, instead of held under a single control, and therefore they constitute an illegal combination in restraint of trade. But there are many other nearly parallel lines which compete in fact with these lines, and have no association with them, and yet supply railroad facilities for much of the same territory which they occupy. Instead of being in restraint of trade, it would appear under the circumstances that they are potent agencies in promoting trade and in furthering the general welfare of the portion of the country which they serve.

Neither the traveling public nor the commercial interests of the country would now be content with several different lines of railway each covering a portion of the distance between Albany and Buffalo, with the delays, expense, and inconvenience incident thereto. Yet in the early days of railroading these were deemed adequate to care for the then existing traffic. When these lines were combined 60 years ago under the control of a single corporation, making one continuous line between those points, it was not believed that the common law against monopolies and combinations in restraint of trade was being violated, but rather that all interests were to be better served and trade promoted by reason of the combination. The same is true when the further combination was made between the New York Central Railroad and the Hudson River Railroad Companies, forming a single company, bearing both names, and making a single line between New York and Buffalo. The fact that this single company now controls directly or indirectly the Lake Shore, the Michigan Central, the Canada Southern, and other lines carrying traffic between Buffalo and Chicago, when there are several other competing lines between those points and all under governmental control, is not sufficient cause in my opinion to hold that this single control, or the agreement made for the benefit of all concerned in it, should be condemned as a violation of what is known as the "Sherman Act" of Congress.

If by any means or within any view these lines are of the character claimed by the plaintiffs, it is only the federal government which would have any standing to enforce the injunctory relief provided under the Sherman law. The only relief which could be had by an individual under that act would be damages, and these actions are not prosecuted with that in view.

I am constrained to believe that the contract in question is not ultra vires or illegal, and for that reason the complaint in each action should be dismissed, with costs.

Ordered accordingly.